30 A.3d 426

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ronald HANIBLE, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 1, 2010.

Decided Oct. 19, 2011.

---

188

190

194

Angela S. Elleman, Defender Association of Philadelphia, for Ronald Hanible.

Hugh J. Burns, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice BAER.

In this capital case, Ronald Hanible ("Appellant") appeals from the Order of the Court of Common Pleas of Philadelphia County ("PCRA court"), which denied without a hearing all guilt phase claims raised in his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.[1] For the reasons that follow, we affirm.

The facts underlying Appellant's two murder convictions are fully set forth in our opinion affirming his judgment of sentence on direct appeal. *Commonwealth v. Hanible*, 575 Pa. 255, 836 A.2d 36 (2003). We reiterate those facts necessary to facilitate an understanding of the issues raised herein.

The record establishes that in the late afternoon on January 15, 1999, while wearing a black ski hat and black sunglasses, Appellant visited the home of his aunt, Catherine McCants.

1. The PCRA court granted Appellant a new penalty hearing with the agreement of the Commonwealth. Thus, no penalty phase issues are before us in this appeal.

McCants' daughter-in-law, Andrea Wilson, was also in the home at the time. Fifteen minutes after his arrival, at approximately 4:45 p.m., Appellant left the home and encountered Eric Wiley, McCants' godson, on the street outside of McCants' home. Appellant suggested to Wiley that the two men rob Milton Wise and Rodney Walters because they routinely "ran numbers" on that particular street and would have cash. Notes of Testimony ("N.T.") 3/5/2001 at 106. This was the second time Appellant discussed with Wiley a plan to rob the two victims. Wiley refused to participate in the robbery on the same block where his godmother resided, and noted his concern that one of the potential victims may be connected to the mob. Appellant responded, "I'll do it without you." *Id.* at 111.

Wiley then left Appellant on the street, and proceeded to McCants' residence. As Wiley did so, he observed Appellant standing in front of a vacant lot, and thought he saw Wise and Walters standing on the opposite side of the street. When Wiley entered McCants' home, he was sweating and flustered, and McCants inquired about what was going on. Wiley responded that he had just seen Appellant, who told him that McCants wanted to see Wiley. After their brief visit, Wiley was about to open McCants' front door to leave when he heard two gunshots. Wiley opened McCants' door and saw Wise lying on the ground with Appellant standing over him, pointing a gun. He then observed Walters run to Wise's aid. Moments later, Wiley heard two more gunshots. As Walters ran to help Wise, Appellant fired two shots at close range into Walters' abdomen. Both Wise and Walters died as a result of the shootings. The police arrived and obtained from the crime scene two black ski hats, and a pair of black sunglasses. McCants identified one of the hats and the sunglasses as being the same items worn by Appellant earlier that afternoon, and identified the other black hat as belonging to Wise, the victim.[2] N.T. 3/2/2001 at 11. On January 19, 1999, four days after the

---

2. As discussed *infra,* the hats were tested for DNA, but no conclusive findings were made because of an inability to obtain a sufficient DNA sample.

murder, police obtained a signed statement from Wiley describing the events as set forth above. A few days later, Appellant was arrested and charged with the murders of Wise and Walters. The police recovered $1,169 on Appellant's person at the time of his arrest.

At trial, the Commonwealth presented the testimony of Wiley. However, while on the witness stand, Wiley repudiated the statement he previously gave police, and testified that he never had a conversation with Appellant about a potential robbery of the victims, did not observe Appellant standing over Wise with a gun, and knew nothing about the murders. Wiley explained that police forced him to make and sign the false statement by physically attacking him and threatening to charge him with the murders. The Commonwealth then effectively impeached its own witness by confronting Wiley with the relevant portions of the statement he gave to police. To bolster the veracity of Wiley's prior statement, the Commonwealth also presented the testimony of the officer who took Wiley's statement, Detective Patrick Mangold. Detective Mangold testified that he did not use physical force or threat to obtain information from Wiley, and did not suggest answers to the questions posed, but rather asked Wiley questions and wrote down his responses verbatim. The Commonwealth further presented the testimony of McCants and her daughter-in-law, Andrea Wilson, which established that Appellant was at McCants' residence moments before the shootings that occurred in front of her home. McCants also testified that Appellant was wearing the same black sunglasses and ski hat that were recovered by police at the murder scene.

A medical examiner testified that Walters sustained two gunshot wounds to his lower abdomen, and that the gun was held against the victim's clothing when the shots were fired. He explained that the bullets pierced the victim's bowel, iliac artery, and kidney, with one bullet exiting the body and the other lodging in the victim's right hip. The medical examiner also testified that Wise suffered a single gunshot wound to the chest. The bullet travelled through his lung and heart, and lodged in his spine. A firearms examiner testified that the

bullets recovered were .38 or .357 caliber and had most likely been fired from a revolver.

Appellant did not testify on his own behalf or present any witnesses at trial. Instead, he urged the jury to reject Wiley's statement to police as unreliable because, as Wiley testified, the statement was given out of fear that Wiley would be charged with the murders if he failed to implicate Appellant. He further contended that Wiley's statement to police was not worthy of belief because a crime scene photo demonstrated that Wiley's view of the shooting through McCants' doorway was obstructed by a van parked in front of her home. Thus, Appellant asserted, Wiley could not have seen what he described in his police statement.

Finally, Appellant argued to the jury that none of the physical evidence recovered by police implicated him in the crime. First, he argued there was no DNA evidence connecting him to either of the hats found at the scene. Second, Appellant maintained that McCants' testimony, which linked him to the hat and sunglasses recovered at the scene, was not credible because McCants may have been trying to "cover up" Wiley's participation in the murders by incriminating Appellant. Third, Appellant argued that the substantial amount of cash found on him when arrested did not implicate him in the crime because the parties stipulated that the victims possessed large sums of money after the murders and robbery occurred.[3]

On March 9, 2001, a jury found Appellant guilty of first degree murder for the killing of Wise, second degree murder for the killing of Walters, two counts of robbery, and possession of an instrument of crime. Following the penalty hearing, the jury found two aggravating circumstances, namely that Appellant committed the murder while in the perpetration of a robbery, 42 Pa.C.S. § 9711(d)(6), and that Appellant had been convicted of another murder, *id.* at § 9711(d)(11),

3. The parties stipulated that when the victims were brought to the hospital, two gold rings, credit cards, and $184 were recovered from Wise's person; $318 was recovered from Walters. N.T. 3/5/ 2001 at 139–40.

and no mitigating circumstances. Accordingly, it returned a verdict of death.

The trial court formally imposed the death sentence on June 13, 2001. Appellant obtained new counsel who thereafter filed a direct appeal raising three issues: (1) whether the evidence, which consisted primarily of a statement that had been repudiated, was sufficient to support the murder convictions; (2) whether the verdict was against the weight of the evidence for this same reason; and (3) whether a new penalty hearing was warranted because the trial court failed to instruct the jury on the mitigating circumstance that Appellant had no significant history of prior criminal convictions. Our Court rejected Appellant's claims, and affirmed Appellant's conviction and sentence. *Commonwealth v. Hanible*, 575 Pa. 255, 836 A.2d 36 (2003). On October 4, 2004, the United States Supreme Court denied Appellant's petition for a writ of certiorari. *Hanible v. Pennsylvania*, 543 U.S. 835, 125 S.Ct. 248, 160 L.Ed.2d 55 (2004).

On November 19, 2004, Appellant filed a *pro se* PCRA petition, and counsel was appointed. The Defender Association of Philadelphia, Federal Court Division, Habeas Corpus Unit, subsequently entered its appearance, and filed an amended PCRA petition and two supplements to that petition, along with a motion for discovery. The Commonwealth filed a motion to dismiss the PCRA petition, but subsequently agreed that a new penalty hearing was warranted due to trial counsel's failure to present available mitigating evidence. The Commonwealth thereafter filed a revised motion to dismiss Appellant's guilt phase claims, in which it opposed discovery and an evidentiary hearing. In response, Appellant filed a letter-brief answer on April 4, 2008, as well as a supplemental appendix.

On July 2, 2008, former Justice Jane Cutler Greenspan, acting as the PCRA court judge, granted a new penalty hearing based on the parties' agreement, and issued a 35–page opinion and notice of intent to dismiss all guilt phase claims without a hearing pursuant to Pa.R.Crim.P. 909. On July 22, 2008, Appellant filed a response to the notice to dismiss in

which he raised no new issues, but supplemented his argument relating to the issues previously presented. Because former Justice Greenspan was elevated to this Court before an order was entered dismissing Appellant's PCRA petition, the matter was reassigned to the Honorable Jeffrey Minehart, who, on March 4, 2009, issued an order granting the Commonwealth's motion to dismiss Appellant's PCRA petition without a hearing, denying Appellant's motion for further discovery, and incorporating former Justice Greenspan's Opinion dismissing all guilt phase claims.

Appellant now raises sixteen issues for review, each of which has several sub-issues.[4] Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Colavita,* 606 Pa. 1, 993 A.2d 874, 886 (2010). The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. *Id.*

Under Pennsylvania Rule of Criminal Procedure 909, which governs PCRA petitions in capital cases, the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806, 820 (2004).

In order to be eligible for PCRA relief, Appellant must prove by a preponderance of the evidence that his conviction

---

4. This Court has jurisdiction over Appellant's appeal because we directly review the denial of post-conviction relief in death penalty cases pursuant to 42 Pa.C.S. § 9546(d).

or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (setting forth the eligibility requirements of the PCRA). Further, Appellant must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding." *Id.* § 9544(b).

■■■ The majority of Appellant's claims challenge the performance of counsel. It is well-established that counsel is presumed effective, and the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 664 (2007). To overcome this presumption, Appellant must demonstrate that: (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the defendant suffered prejudice as a result of counsel's deficient performance. *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001). A claim of ineffectiveness will be denied if the defendant's evidence fails to meet any one of these prongs. *Id.* at 221–22.[5]

■■■ With regard to the reasonable basis prong, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 594 (2007). We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an

5. While the Pennsylvania test for ineffectiveness is the same as the performance and prejudice standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in application, this Court has characterized the test as tripartite, by dividing the performance element into two distinct parts, *i.e.*, arguable merit and lack of reasonable basis. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 225 n. 8 (2007).

alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Williams,* 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (citation omitted). To establish the prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. *Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 954 (2008).

 In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), which was decided before Appellant's direct appeal was filed,[6] this Court abrogated the rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where a defendant has new counsel, *see Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977), and held that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* 813 A.2d at 738. Thus, Appellant's first opportunity to challenge trial counsel's effectiveness was in his PCRA petition, and he need not address appellate counsel's performance in order to preserve the underlying claim of trial counsel ineffectiveness.[7]

Prior to addressing the merits of Appellant's claims, we note that the majority of the issues presented entail multiple sub-issues, many of which are entirely unrelated to each other; while other issues overlap in substantial part. Appellant also offers substantial analysis establishing the arguable merit of separate sub-issues of a single issue, yet sets forth a combined analysis of the reasonable basis and prejudice prongs of the ineffective assistance of counsel standard. In an effort to afford full review to all claims raised, we will set forth

6. This Court entered its ruling in *Grant* on December 31, 2002, and Appellant's direct appeal was filed on August 27, 2003.

7. Nevertheless, Appellant repeatedly challenges appellate counsel's effectiveness for failing to raise each substantive issue on direct appeal. As Appellant's direct appeal was submitted after our decision in *Grant,* appellate counsel could not have challenged trial counsel's effectiveness on direct appeal, and likewise cannot be deemed ineffective for failing to do so. Thus, further discussion of Appellant's derivative claims of appellate counsel ineffectiveness is unnecessary.

Appellant's argument on each issue, and dispose of each contention in an order that facilitates a comprehensive understanding of the claims raised.

## I. Counsel Ineffectiveness for Failing to Challenge Appellant's Conviction on Due Process and Sixth Amendment Grounds

▆▆▆ Appellant first contends that trial counsel was ineffective for failing to challenge his conviction, *via* a motion for judgment of acquittal, on two separate grounds: due process and the Sixth Amendment.[8]

### A. Due Process

Appellant submits there is arguable merit to the underlying claim that his first degree murder conviction violates due process because it was based upon the least reliable form of evidence—the statement Wiley gave to police and repudiated at trial. He explains that his conviction violates due process because Wiley's statement is uncorroborated by any other witness, and is inherently unreliable. Appellant characterizes the jury's verdict as being based upon nothing more than hearsay accusations made by Wiley, who had every reason to accuse Appellant falsely to avoid his own prosecution for the offense.[9] He emphasizes that Wiley was the only individual to identify him as the shooter, and provided the only evidence of a planned robbery. Appellant further asserts there was no DNA evidence linking him to the crime, no gun recovered from the scene, and no "reliable" evidence linking him to the physical evidence found at the murder scene. Under these

8. To the extent this claim can be construed as raising substantive challenges to Appellant's conviction on due process and Sixth Amendment grounds, these claims are waived as they were never raised on direct appeal. *See* 42 Pa.C.S. § 9544(b) (providing that a PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding").

9. Appellant further suggests that trial counsel should have made an appropriate objection to the introduction of Wiley's statement at trial, *see* Appellant's Brief at 15, and the Commonwealth responds to this contention. We defer discussion of this particular component of the claim until examination of Issue II, which directly implicates counsel's failure to object to the admission of Wiley's statement.

circumstances, Appellant posits, trial counsel should have filed a motion for judgment of acquittal before the case went to the jury, contending that a conviction based on the Commonwealth's evidence would violate due process.

Concerning the second prong of the ineffectiveness test, Appellant contends that trial counsel had no reasonable basis for failing to seek relief in the trial court based on a due process violation, particularly where counsel's argument to the jury focused on the unreliability of the evidence, and the untrustworthiness of Wiley's statement to police. Appellant's Brief at 15. As to the prejudice prong of the ineffectiveness test, Appellant states, without elaboration, that "[h]ad counsel made a timely motion to the court, there is a reasonable likelihood that it would have been granted and the charges against Appellant resolved in his favor. The prejudice could not be more extreme." *Id.* at 15–16.

In resolving this issue, the PCRA court concluded that this claim was previously litigated because Appellant challenged the sufficiency of the evidence on direct appeal, arguing that Wiley's recanted statement was insufficient to support his murder convictions. Appellant contends that the PCRA court erred in finding this claim previously litigated because his current claim of constitutional error raised in his PCRA petition is distinct from the challenges to the sufficiency and weight of the evidence raised on direct appeal.

In response, the Commonwealth asserts that trial counsel was not ineffective for failing to challenge Appellant's conviction on the ground that it would violate due process. Initially, it maintains that the PCRA court properly found the issue to be unreviewable as previously litigated because our Court on direct appeal specifically rejected challenges to the sufficiency and weight of the evidence, which were based on the alleged unreliability of Wiley's recanted statement to police. The Commonwealth argues that although Appellant's current claim is couched in terms of due process, the claim is essentially the same as that raised on direct appeal.

As to the merits of the ineffectiveness claim, the Commonwealth submits that Appellant has failed to satisfy his burden

of demonstrating the ineffectiveness of counsel. It emphasizes that to overcome the presumption that counsel was effective, a defendant must show that counsel's conduct was deficient or "outside the wide range of professionally competent assistance," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Appellant failed to do so here, the Commonwealth maintains, because trial counsel made all the arguments to the jury which Appellant faults him for failing to raise, *i.e.*, that the jury should discredit Wiley's statement because he may have been involved in the crime; that Wiley never adopted his statement to police, and instead asserted that the police forced him to make the statement; that Wiley's view of the shooting through McCants' door was obstructed by a van parked in front of McCants' house; that the presence of money in the victims' pockets casts doubt on Wiley's statement that Appellant planned to rob the victims; and that there was no DNA evidence confirming that the hat and sunglasses found at the scene belonged to Appellant. According to the Commonwealth, trial counsel's presentation of these arguments to the jury, instead of presenting them to the court *via* a motion for judgment of acquittal based on a violation of due process, was reasonable. Moreover, the Commonwealth submits, Appellant has failed to demonstrate prejudice because there was no chance that the trial court would have granted the motion for judgment of acquittal. *See Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346, 355 (1999) (counsel cannot be deemed ineffective for declining to present a meritless claim).

We begin by recognizing that the PCRA court erroneously found this claim to be previously litigated pursuant to 42 Pa.C.S. § 9544(a)(2) (providing that an issue has been previously litigated if "the highest court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue."). We agree with Appellant that this Court on direct appeal did not rule on the merits of the issue raised herein, which challenges counsel's performance. *See*

*Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 573 (2005) (holding that a Sixth Amendment claim alleging ineffective assistance of counsel raises an issue cognizable under the PCRA even if the claim underlying the ineffectiveness claim has been previously litigated). Moreover, the underlying issues raised on direct appeal are distinct from those raised in Appellant's PCRA petition because the former issues challenged the sufficiency and weight of the evidence, while the later allege a due process violation. The fact that all claims are premised upon a purported lack of reliability of the evidence supporting the first degree murder conviction does not render the instant claim unreviewable as previously litigated.

We therefore proceed to address the ineffectiveness issue. Even assuming, for purposes of discussion, that there is arguable merit to the claim, Appellant has failed to demonstrate the remaining two prongs of the ineffectiveness test. As to the reasonable basis prong, we recognize that, generally, the court should not glean from the record whether counsel had a reasonable basis for his action or inaction absent an evidentiary hearing, and that it is only in the most clear-cut cases that the reasons for counsel's conduct are apparent from the record. *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003). That being said, a PCRA petitioner must set forth a basis upon which to find trial counsel's performance constitutionally deficient. Appellant fails to offer any persuasive authority establishing that trial counsel acted unreasonably in emphasizing the unreliability of the evidence in his arguments to the jury and in his challenges to the weight and sufficiency of the evidence on appeal, rather than couching his claim in terms of due process in a motion for judgment of acquittal. In fact, he offers no Pennsylvania case in which similar relief has been granted on due process grounds, and upon which trial counsel purportedly should have relied in making a due process challenge.[10] The record supports the Commonwealth's assertion that trial counsel made all the underlying arguments relating to the unreliability of the evi-

10. We offer no opinion on whether due process is violated when a conviction is based solely upon recanted testimony, an issue which is

dence to the jury and on direct appeal, which Appellant now faults him for failing to raise. Counsel's failure to pose them as a challenge to due process does not render his performance constitutionally deficient, absent some authority existing at the time of trial that would have prompted trial counsel to pursue the issue sounding in due process. Because the strategy actually pursued by trial counsel was reasonably designed to effectuate Appellant's interests, he has failed to demonstrate a lack of reasonable basis. *See Washington*, 927 A.2d at 594 (providing that "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis.").

 Moreover, Appellant's ineffectiveness claim also fails for lack of prejudice because Appellant has not demonstrated that there is a reasonable probability that the trial court would have granted a motion for judgment on acquittal on due process grounds or that counsel would have been successful had he raised such issue on direct appeal. *See Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1084 (2006) (holding that to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different). As noted by the Commonwealth, the trial court considered all of Appellant's contentions regarding the purported unreliability of the evidence presented against him, albeit under the independent rubric of challenges to the weight and sufficiency of the evidence. The trial court rejected these contentions, and this Court affirmed those rulings on direct appeal. Significantly, in doing so, both the trial court, as well as this Court, expressly rejected the essential premise of Appellant's current due process claim, *i.e.*, that the evidence supporting his first degree murder conviction was unreliable

currently pending before our court in *Commonwealth v. Brown*, 5 EAP 2010, but merely point out the dearth of case law on the topic for purposes of examining the reasonableness of the tactic employed by counsel at the time of trial. Further, unlike the circumstances in *Brown*, and as emphasized *infra*, Appellant's conviction was not based solely upon the recanted prior statement of Wiley, but was supported by other evidence.

and insufficient as a matter of law.[11] As we noted on direct appeal, Appellant's conviction was not based solely on Wiley's recanted statement. Rather, the testimony of McCants and her daughter-in-law placed Appellant at the scene moments before the shooting, and items found at the scene were identified as belonging to Appellant. As Appellant has failed to demonstrate that that there is a reasonable probability that a challenge to his conviction based on due process would have been successful, he has failed to establish the requisite prejudice necessary to support his claim of ineffectiveness.

## B. Sixth Amendment

Appellant next contends that trial counsel was ineffective for failing to file a motion for judgment of acquittal on

11. This Court stated on direct appeal:

[T]he mere fact that Wiley recanted a statement he had previously made to the police certainly does not render the evidence insufficient to support Appellant's conviction. Rather, the jury was free to evaluate both Wiley's statement to police as well as his testimony at trial recanting that statement, and free to believe all, part, or none of the evidence. *See Commonwealth v. Pitts*, 486 Pa. 212, 404 A.2d 1305 (1979) (jury is free to believe all, part or none of the evidence presented). It is not for this Court to reweigh the evidence and substitute its judgment for that of the fact-finder. *See Commonwealth v. Gibson*, 553 Pa. 648, 720 A.2d 473, 480 (1998) ("Credibility determinations are strictly within the province of the finder of fact; therefore, an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact."). Moreover, in making his claim, Appellant ignores the additional circumstantial evidence that pointed to him as the killer, including the testimony of several other individuals that placed him at the scene of the crime near the time of the shooting, as well as the fact that his personal effects were found at the crime scene. Thus, Appellant's claim that the evidence was insufficient to support his first-degree murder conviction fails.

In his second claim, Appellant argues that he should be granted a new trial because the verdict was against the weight of the evidence. However, given the evidence as outlined above, including Wiley's statement to police, eyewitness testimony placing Appellant at the crime scene, and the presence of Appellant's personal effects at the scene, it certainly cannot be said that the jury's verdict shocks one's sense of justice. *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1189 (1994) (this Court may only reverse the jury's verdict on the basis that it is against the weight of the evidence if that verdict is "so contrary to the evidence as to shock one's sense of justice").
*Hanible*, 836 A.2d at 39–40.

grounds that he was denied his Sixth Amendment right to confrontation because Wiley's accusations could not be adequately tested through cross-examination.[12] He submits that there is arguable merit to the claim because, at trial, Wiley refused to adopt the accusations as his own, and indicated that he made the statement only because he had been beaten and threatened by police. Thus, Appellant concludes that he was denied the right of confrontation because meaningful cross-examination of Wiley regarding the critical accusatory details of his statement was impossible.

In support of his contention, Appellant relies on *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). In *Douglas,* after being found guilty in a separate trial, an accomplice of the accused invoked the Fifth Amendment against self-incrimination when the accomplice was called to testify at the accused's trial. Thereafter, the prosecutor read to the jury the accomplice's written confession, which included information implicating the accused. The High Court in *Douglas* ruled that the accused's inability to cross-examine the accomplice about the purported confession denied him the right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.

Appellant submits that the same result is warranted here, and trial counsel should have pursued such theory in a motion for judgment of acquittal before the case reached the jury. Appellant makes no individualized proffer as to the reasonable basis and prejudice prongs of the ineffectiveness standard, other than that set forth in relation to the due process component of the claim discussed in Issue I(A). Further, the PCRA court did not independently evaluate this Sixth Amendment claim, but rather found the combined claim of due process/Sixth Amendment to have been previously litigated as set forth above.

12. The Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." U.S. CONST. amend. VI.

The Commonwealth responds that Appellant's claim lacks arguable merit under the Sixth Amendment because the High Court's ruling in *Douglas* does not apply to a prior inconsistent statement of a testifying witness. It emphasizes that unlike the declarant in *Douglas*, Wiley actually testified at Appellant's trial, and therefore was subject to cross-examination by trial counsel. "It is the presence of the witness in the courtroom, subject to cross-examination, that enables a jury (unlike an appellate court) to determine whether or not to credit a prior inconsistent statement." Commonwealth's Brief at 24. Under such circumstances, the Commonwealth maintains, there can be no Sixth Amendment violation to support the claim of trial counsel ineffectiveness.

We agree with the Commonwealth that there is no arguable merit to Appellant's underlying claim that his Sixth Amendment confrontation rights were violated. It is well-settled that admitting a declarant's prior inconsistent statement does not violate the Confrontation Clause of the Sixth Amendment when the declarant, himself, testifies as a witness at trial and is subject to cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"); *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (holding that where the declarant is not absent, but is present to testify and to submit to cross-examination, the admission of his out-of-court statements does not create a confrontation problem). Trial counsel had every opportunity to cross-examine Wiley at trial, and, in fact, did so, eliciting details regarding why he gave the "false" statement implicating Appellant to police. *See* N.T. 3/5/2001 at 64–82. Accordingly, there is no legal basis to support Appellant's suggestion that trial counsel should have filed a motion for judgment of acquittal based upon a violation of the Sixth Amendment right to confrontation, and counsel cannot be deemed ineffective for failing to raise a baseless claim.

## II. Counsel Ineffectiveness for Failing to Object to Wiley's Statement

Appellant next argues that trial counsel was ineffective for failing to object to the admission of Wiley's prior statement to police as substantive evidence of Appellant's guilt, and for failing to seek a jury instruction in this regard.[13, 14] He argues that Wiley's statement to police is inherently unreliable, and fails to satisfy the requisites for admission of prior inconsistent statements set forth in *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992), and Pa.R.E. 803.1(1).[15] In *Lively*, this Court held that the admission of a prior inconsistent statement of a non-party witness shall be used as substantive evidence only when: (1) the statement was given under oath at a formal legal proceeding; or (2) the statement is reduced to a writing signed and adopted by the declarant; or (3) the statement is recorded verbatim contemporaneously with the making of the statement. *Id.* at 10.[16]

Appellant challenges the lower court's finding that Wiley's statement was "signed and adopted by the declarant." The crux of his claim is that Wiley never "adopted" his statement

13. Appellant concedes that Wiley's prior statement would be admissible to impeach Wiley's trial testimony that he had no knowledge of the murders. He challenges only the admissibility of the statement as substantive evidence of Appellant's guilt.

14. To the extent this claim can be construed as raising a substantive challenge to Appellant's conviction based on the inadmissibility of Wiley's statement, this claim is waived as it was not raised on direct appeal. *See* 42 Pa.C.S. § 9544(b).

15. Rule 803.1(1) mirrors our holding in *Lively* and provides as follows:
The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement:
(1) Inconsistent statement of witness. A statement by a declarant that is inconsistent with the declarant's testimony, and (a) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) is a writing signed and adopted by the declarant, or (c) is a verbatim contemporaneous recording of an oral statement.
Pa.R.E. 803.1(1).

16. Only the second alternative for demonstrating admissibility of a prior inconsistent statement is at issue here because Wiley's statement was neither made under oath at a formal proceeding nor recorded.

at trial, but rather repudiated it, raising a question as to whether the statement was ever made. Further, Appellant submits, Wiley's statement to police is not trustworthy for the myriad of reasons he asserted in Issue I(A), particularly that Wiley was motivated to accuse Appellant falsely because the police threatened Wiley with prosecution for the instant murders. Accordingly, Appellant asserts there is arguable merit to the underlying claim that Wiley's statement is inadmissible as substantive evidence. He maintains that trial counsel should have objected to the admission of such statement, and requested an appropriate limiting instruction, informing the jury that it could consider Wiley's prior inconsistent statement to police only to impeach Wiley's trial testimony that he had no intimate knowledge of the murders, and not as substantive evidence of Appellant's guilt.

Regarding the second prong of the ineffectiveness test, Appellant asserts that Wiley's statement was the most important evidence in the Commonwealth's case, and trial counsel had no reasonable basis for failing to at least seek an instruction cautioning the jury against considering Wiley's prior statement for the truth of its contents. Finally, he submits that he satisfied the prejudice prong of the ineffectiveness test because, had trial counsel made the proper objection and sought the appropriate jury charge, there is a reasonable likelihood that the requested relief would have been granted and the jury would have been prohibited from considering Wiley's statement to police as substantive evidence of his guilt. Appellant maintains that the outcome of the trial would have been different because the jury had no other reliable evidence upon which to base a conviction of first degree murder.

The Commonwealth counters that there is no arguable merit to Appellant's claim that trial counsel provided constitutionally deficient representation when he failed to object to Wiley's statement on the ground that Wiley did not "adopt" such statement at trial. According to the Commonwealth, the statement was plainly admissible under *Lively* because the requirement that a statement be "signed and adopted" does not mean that the statement must be adopted at trial. Rath-

er, the Commonwealth asserts, a prior inconsistent statement is admissible as substantive evidence if there is a contemporaneous acknowledgement that the written statement accurately reflects what the witness said. It maintains that "Wiley adopted his statement when he signed it—his signature served as an attestation that the statement accurately recounted his words." Commonwealth's Brief at 27. To focus on the declarant's adoption of the statement at trial, the Commonwealth suggests, is simply absurd because a statement reaffirmed by a declarant at trial would never be "inconsistent" with the declarant's trial testimony, and thus would never be subject to the rules governing prior inconsistent statements. Because Wiley acknowledged at trial that he signed the statement when it was made, and the detective who interrogated him corroborated that Wiley made such statement, the Commonwealth concludes there is no question that Wiley adopted his prior inconsistent statement to police for purposes of determining admissibility pursuant to *Lively*. Hence, it asserts that the statement is admissible as substantive evidence of Appellant's guilt, and trial counsel cannot be deemed ineffective for failing to object or seek an unwarranted jury charge.[17]

The PCRA court likewise found no arguable merit to Appellant's claim, holding that substantive use of Wiley's statement was proper and in compliance with the requisites of *Lively* because Wiley adopted his statement by signing it, the statement was inconsistent with testimony Wiley gave at trial, and Wiley was available for cross-examination. PCRA Ct. Slip Op. at 8 (CP Philadelphia Jul. 2, 2008).

We agree with both the Commonwealth and the PCRA court that Appellant's claim fails for lack of arguable merit. Appellant's position that Wiley's statement was not "adopted" by him because he repudiated it at trial is untenable. Our holding in *Lively* is premised upon the notion that

17. Moreover, the Commonwealth asserts there is no factual basis for this claim of ineffectiveness because trial counsel did, in fact, object to the prosecutor's use of Wiley's statement on the grounds that "[h]e hasn't adopted this," N.T. 3/5/2001 at 23, but such objection was, not surprisingly, unsuccessful.

the statement sought to be admitted is, in fact, inconsistent with the testimony given by the witness at trial. Thus, as the Commonwealth recognizes, adoption of the statement by the witness at trial is unnecessary as it would obviate the need to incorporate the evidentiary rules for prior inconsistent statements. Wiley adopted his prior statement to police when he signed each page of the document. Both Wiley and the detective interrogating him confirmed this fact at trial. Thus, the requisites of *Lively* were satisfied and the jury was free to consider Wiley's prior statement to police for the truth of the matter asserted therein, and as substantive evidence of Appellant's guilt. *See Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811, 818 (1994) (holding that a statement that the witness had previously given to police, which had been reduced to writing and signed by the witness, but which was repudiated by the witness at trial, was admissible as substantive evidence because the requirements of *Lively* were satisfied). Consequently, Appellant's claim of trial counsel ineffectiveness fails for lack of arguable merit.

### III. Ineffectiveness for Failing to Refute Wiley's Prior Statement to Police

Appellant argues that trial counsel was ineffective for failing to refute Wiley's statement to police by presenting evidentiary proof that Wiley's view of the crime was obstructed. He concedes that trial counsel suggested to the jury that Wiley's view was compromised by doing the following: (1) submitting into evidence a police photo, which showed two large vehicles parked in front of McCants' home; (2) asking McCants at trial whether a van, as shown in the police photo, had been parked in front of her residence, N.T. 3/2/2001 at 33–34; (3) asking Wiley at trial to note "the two blue vans" in the photo, N.T. 3/5/2001 at 78; (4) eliciting Detective Mangold's acknowledgement that he had not asked Wiley about "the van being in his line of vision," *Id.* at 125; and (5) arguing to the jury that the van obstructed Wiley's view of the shootings. N.T. 3/6/2001 at 17–18. Appellant maintains, however, that merely suggesting to the jury that Wiley's view was obstructed was insufficient,

and that trial counsel was ineffective for failing to present evidentiary proof of the same.

Specifically, Appellant submits that had trial counsel conducted a reasonable investigation and interviewed McCants and her daughter-in-law prior to trial, he would have discovered that the witnesses believed Wiley could not have seen what he claimed to have seen from McCants' front door. He attached to his PCRA petition declarations from McCants and her daughter-in-law, indicating the same. *See* Appellant's Brief, Appendix, Volume II, Exhibit 13 at ¶ 7 (wherein McCants declares "[t]here is no way for anyone to see what happened from my doorway; the van was in the way"); *id.* Exhibit 14 at ¶ 2 (wherein Andrea Wilson asserts, "there is no possible way that [Wiley] could see what was happening on the street or who the shooter was. The door was closed!").[18]

In further support of the claim that trial counsel should have presented evidentiary proof of Wiley's obstructed view, Appellant maintains that counsel should have sought funding to obtain a crime scene expert to opine as to the inability of Wiley to view the shootings from McCants' entryway. Attached to his PCRA petition is a declaration from a forensic investigation specialist, who asserted that he studied the crime scene and documentation relating to the case years after the offense, and concluded that Wiley's view of the shootings would have been obstructed had he been standing at the location set forth in his police statement. *See id.,* Exhibit 17 at ¶ 22 (wherein R. Robert Tressel opines that, based upon his measurements and calculations, it would be "impossible for Wiley to have seen what he purports to have seen from inside the threshold of [McCants'] door"). Thus, Appellant concludes there is arguable merit to his claim that trial counsel was ineffective for failing to present the aforementioned evidentiary proof establishing that Wiley could not possibly have seen Appellant commit the offense, rather than merely suggesting the same to the jury.

18. Andrea Wilson's declaration did not mention a van being parked in front of McCants' residence.

As to the reasonable basis and prejudice prongs of the ineffectiveness test, Appellant emphasizes that Wiley's ability to see the crime from the doorway of McCants' home was crucial. Under these circumstances, he concludes, trial counsel could have had no reasonable basis for failing to present evidentiary proof of the obstructed view. Appellant further concludes that had the proffered evidence from McCants, Wilson, and the forensic investigation specialist been presented to the jury, it would have cast doubt on the truthfulness of Wiley's claimed observation. As this case is based on credibility, Appellant asserts, he was prejudiced by counsel's omission because there is a reasonable likelihood that the verdict would have been different if the jury was presented with the proffered evidence.

The Commonwealth responds that Appellant's claim of ineffectiveness fails for lack of a factual basis because trial counsel did, in fact, present evidence that Wiley's view of the crime scene from McCants' doorway was obstructed. It argues that trial counsel's failure to produce additional evidence to establish the same point cannot amount to ineffectiveness. Moreover, the Commonwealth submits that trial counsel could not have anticipated that McCants would recant her trial testimony and later assert that it would be impossible for Wiley to have viewed the crime. It further maintains that McCants' daughter-in-law's subsequent declaration that McCants' door was closed when the shootings occurred is unpersuasive because it is inconsistent with the testimony established at trial. Finally, the Commonwealth argues, trial counsel was not ineffective for failing to hire a forensic investigation expert because the crime scene experts who actually investigated the scene at the time of the offense produced the helpful photograph of the van that trial counsel presented in support of his argument to the jury that Wiley's view was obstructed.

The PCRA court rejected Appellant's claim, finding that independent investigation by trial counsel would have been "superfluous" because "trial counsel clearly presented evidence that the van would have obstructed Mr. Wiley's view from Ms. McCants' doorway." PCRA Ct. Slip Op. at 7–8.

The court further emphasized that Wiley's ability to see the shootings from that particular spot was not determinative of the trial's outcome because part of the defense strategy was to suggest that Wiley, himself, had committed the offense, making the positioning of the van irrelevant. *Id.* at 8.

 We agree with the PCRA court that Appellant's claim of trial counsel ineffectiveness fails for lack of arguable merit. As noted, trial counsel directly questioned McCants about the location of the van, using crime scene photographs to support an argument to the jury that Wiley could not have seen what he claimed to have seen in his statement. He further reiterated the existence and position of the van in his cross-examination of Wiley and Detective Mangold. Hence, trial counsel cannot be deemed ineffective for failing to present additional evidence of this sort. *See Commonwealth v. Mason,* 559 Pa. 500, 741 A.2d 708, 717–18 (1999) (holding that where proposed evidence is cumulative of testimony at trial, counsel cannot be deemed ineffective for failing to present it). Further, trial counsel cannot be deemed ineffective for failing to obtain the opinion of an independent crime scene expert when the forensic investigators who actually examined the scene obtained evidence favorable to Appellant, which trial counsel utilized in his cross-examination of the Commonwealth's witnesses. *See Commonwealth v. Williams,* 537 Pa. 1, 640 A.2d 1251, 1265 (1994) (holding that "trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony"). Appellant, therefore, is not entitled to relief on this claim.

### IV. Ineffectiveness for Failing to Investigate Wiley's Background for Impeachment Purposes

Appellant argues that trial counsel was ineffective for failing to investigate Wiley's background to discover the following evidence, which could have been used to impeach and discredit Wiley: (1) Wiley's previous juvenile adjudication for theft; (2) Wiley's previous murder charges, which had been *nolle prossed* prior to Appellant's trial; (3) Wiley's previous criminal

charges for, *inter alia,* robbery and attempted murder, which were pending at the time of Appellant's trial; and (4) an immunity agreement the Commonwealth purportedly offered to Wiley after he indicated at Appellant's preliminary hearing that he had no knowledge of the murders.

Relating to the juvenile adjudication for theft, Appellant asserts, without further elaboration, that "counsel did not impeach Wiley with his juvenile adjudication for theft, though such impeachment would have been proper." Appellant's Brief at 30. As to Wiley's prior unrelated criminal charges (referenced as (2) and (3), *supra* ), Appellant implies that the police may have used these charges against Wiley in an effort to obtain his statement implicating Appellant in the instant murder. He emphasizes that trial counsel did not seek discovery relating to such criminal charges, and did not question Detective Mangold or Wiley as to whether these incidents played a role in Wiley's encounter with police that led to the giving of his statement. As to the immunity agreement, Appellant offers only that "[r]easonably diligent counsel would have requested discovery regarding the specifics and scope of the offer made to Wiley." Appellant's Brief at 32. Appellant concludes that his ineffectiveness claim has arguable merit because trial counsel could have investigated these areas and used such evidence to impeach and discredit Wiley and his statement to police.

As to the second prong of the ineffectiveness test, Appellant asserts that trial counsel's omissions constitute "inexplicable lapses," that could have no reasonable basis designed to effectuate his interests. Appellant's Brief at 32–33. He further claims that he was prejudiced because, had trial counsel discovered the proffered evidence, he could have provided the jury with compelling reason to discredit the single most important piece of evidence against Appellant—Wiley's statement. He emphasizes that had the jury been provided with a complete picture regarding Wiley and his dealings with police, there is a reasonable likelihood that the verdict would have been different. Finally, Appellant contends that the PCRA

court abused its discretion by denying discovery and an evidentiary hearing on this issue.

The Commonwealth counters that trial counsel was not ineffective for failing to impeach Wiley with the proffered evidence, which amounts to nothing more than unrelated criminal charges against Wiley that had been dismissed at the time of Appellant's trial,[19] unrelated criminal charges against Wiley that had been pending at the time of Appellant's trial, and a non-existent immunity offer.[20] Globally responding to all proffered items of evidence, the Commonwealth argues that there can be no arguable merit to Appellant's claim alleging trial counsel's failure to impeach Wiley because Wiley never testified favorably to the Commonwealth. By repudiating his prior statement to police at trial, the Commonwealth asserts that Wiley became a defense witness, and that it was "in [Appellant's] interests *not* to impeach his testimony disavowing the authenticity and accuracy of his statement." Commonwealth's Brief at 34 (emphasis added).

The Commonwealth further addresses individually the purported items of impeachment evidence proffered by Appellant. Relating to the charges against Wiley that had previously been dismissed, the Commonwealth argues that the ineffectiveness claim fails because trial counsel would have had no reason to confront Wiley with these matters as they have no relevance to his credibility. As to the criminal charges pending against Wiley at the time of Appellant's trial, the Commonwealth submits that the jury was made aware of these charges when the prosecutor elicited such information on direct examination. See N.T. 3/5/2001 at 62 (wherein the prosecutor asked Wiley, "after you were interviewed by the police, you were down at the Police Administration Building, and you were arrested, for Felony charges not related to this

19. To be precise, the Commonwealth explains that while the murder and robbery charges against Wiley were dismissed, he was held for trial on aggravated assault charges, but was acquitted on December 16, 1999, prior to Appellant's trial.

20. The Commonwealth asserts that Appellant abandoned on appeal his claim as it relates to his juvenile adjudication for theft because he sets forth no argument whatsoever concerning that component of the claim.

case; is that correct?"). Thus, it maintains, trial counsel cannot be faulted for failing to present evidence that was already admitted at trial. Moreover, the Commonwealth discounts as pure speculation Appellant's suggestion that the detective may have used Wiley's unrelated criminal activity to obtain his statement implicating Appellant. It concludes that Appellant's imagination cannot serve as a substitute for a legal ineffective assistance of counsel analysis.

Finally, as to the purported immunity agreement, the Commonwealth asserts that it drafted such agreement as a precaution after Wiley announced his intention to invoke his Fifth Amendment right to remain silent at Appellant's preliminary hearing. It clarifies, however, that it never offered the immunity agreement to Wiley because Wiley's counsel determined that his proposed testimony would not implicate the Fifth Amendment. Thus, the Commonwealth maintains, the unexecuted immunity agreement was irrelevant and unavailable as evidence of impeachment.

The PCRA court ruled that Appellant's claim that trial counsel was ineffective in his investigation of Wiley's background and in his cross-examination of Wiley was "baseless and unsupported by the record." PCRA Ct. Slip Op. at 6. The court did not specifically address that component of the claim relating to Appellant's juvenile adjudication for theft. As to the dismissed and pending criminal charges, the court held that trial counsel correctly declined to cross-examine Wiley because Wiley's trial testimony was favorable to Appellant, in that he recanted his previous statement implicating Appellant in the murders. Hence, it noted that the Commonwealth, and not the defense, would desire to impeach Wiley's trial testimony with his prior statement. *Id.* at 7. The PCRA court concluded that "[c]learly, counsel made a strategic decision to show Wiley to be truthful at trial and to have lied in his prior statement." *Id.* at 7. Finally, it held that any attempted impeachment of Wiley with an immunity agreement would have been precluded because Wiley never received immunity from the Commonwealth.

██ The PCRA court's conclusion that trial counsel had a reasonable strategy in not cross-examining Wiley on the various items of evidence proffered herein is supported by the record, and free of legal error. Simply put, Wiley's testimony at trial was favorable to Appellant as it repudiated his previous statement implicating Appellant in the murders. We decline to hold that trial counsel rendered constitutionally deficient representation when he failed to impeach testimony favorable to his client. Had trial counsel cross-examined Wiley with the proffered evidence, as Appellant suggests, he would likely now be challenging counsel's performance in that regard.

██ Although we appreciate that Appellant's ineffectiveness claim is nuanced and is directed primarily at trial counsel's failure to "impeach" Wiley's statement to police, rather than his trial testimony repudiating such statement, we find that Appellant has failed to demonstrate that the proffered evidence would have accomplished such result. First, Appellant has not demonstrated how Wiley's previous juvenile adjudication for theft would have served to discredit only Wiley's statement to police, but not his trial testimony in favor of Appellant. Second, Appellant has not demonstrated that Detective Mangold used Wiley's pending or dismissed criminal charges to induce Wiley to give a statement implicating Appellant in the instant murders.[21] Appellant's suggestion that Detective Mangold may have done so is mere conjecture, not grounded in any evidence of record.[22] To the contrary, Wiley testified that Detective Mangold threatened him with prosecution for the instant murders to obtain his statement implicat-

---

**21.** In fact, Wiley was not charged with the "pending" criminal offenses until March, 15, 1999, nearly two months after Wiley gave his statement to police.

**22.** While Appellant implies that any failure to prove his claim is the result of the PCRA court's refusal to grant discovery of the voluminous police records relating to Wiley's enumerated criminal charges, he fails to explain why PCRA counsel could not have obtained a declaration from Wiley or Detective Mangold, the primary individuals who could confirm or deny such an allegation, to determine whether Wiley's previous criminal proceedings served as an impetus for garnering Wiley's statement against Appellant.

ing Appellant. Thus, the jury already possessed clear evidence from Wiley, himself, that his statement implicating Appellant had been coerced. Wiley never suggested at trial that Detective Mangold invoked improperly Wiley's dismissed or pending criminal charges during his interrogation. Third, Appellant has failed to demonstrate how an immunity agreement that was drafted by the Commonwealth, but was never offered to Wiley, would have served to discredit Wiley's statement to police. We emphasize that this is a collateral proceeding at which Appellant, as petitioner, bears the burden of proving entitlement to his claim. Appellant has failed to do so here, and this ineffectiveness claim fails for lack of arguable merit.[23]

■ We further conclude that the PCRA court did not abuse its discretion by denying discovery and an evidentiary hearing on this meritless claim. We review the denial of a discovery request in post-conviction proceedings for abuse of discretion. *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 749–50 (2004). Discovery requests in the context of a PCRA petition in a death penalty case are addressed in Pennsylvania Rule of Criminal Procedure 902(E)(2), which provides as follows:

23. In a related claim, Appellant argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to turn over to trial counsel evidence relating to Wiley's previous criminal charges, as discussed in this issue, and the purported immunity agreement, which we have concluded was never executed. Under *Brady*, the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. "[T]o establish a *Brady* violation, a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant." *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1126 (2008). We reject Appellant's *Brady* claim in this regard because he has failed to demonstrate that evidence of Wiley's criminal charges would have served as exculpatory and/or impeachment evidence, considering that Wiley testified in favor of Appellant at trial. Likewise, as noted, Appellant has failed to demonstrate that the purportedly withheld evidence would have served to discredit Wiley's statement to police, without adversely affecting his trial testimony in favor of Appellant.

On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

Pa.R.Crim.P. 902(E)(2). We have held that a "showing of good cause requires more than just a generic demand for potentially exculpatory evidence...." *Commonwealth v. Chambers,* 570 Pa. 3, 807 A.2d 872, 889 (2002); *see also Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 91–92 & n. 15 (1998) ("wholesale discovery of whatever information [petitioner] 'believed' to exist and/or of entire files so that he could discern whether his assertions were true" exceeds permitted discovery). Appellant has failed to demonstrate good cause for further discovery on this claim.

■ Regarding the trial court's denial of Appellant's request for an evidentiary hearing, we reiterate that Pa. R.Crim.P. 909, which governs PCRA petitions in capital cases, provides that the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806, 820 (2004). Appellant has failed to satisfy this burden as his reliance on speculation, and failure to assert facts, which, if believed, would support his claim cannot be equated with a genuine issue concerning a material fact that warrants an evidentiary hearing.

## V. Ineffectiveness in Failing to Investigate McCants' and Wilson's Background for Impeachment Purposes

Appellant next contends that trial counsel was ineffective for failing to investigate facts that could have been used to

impeach Commonwealth witnesses, McCants and Wilson, to undermine Wiley's statement to police, and to support the defense that Wiley was the perpetrator. As noted, McCants' testimony placed Appellant at the scene of the crime moments before the murder occurred, established that Wiley was inside McCants' home at the time the fatal shots were fired, and identified the ski hat and sunglasses found at the scene as having been worn by Appellant earlier that afternoon. Wilson, who is McCants' daughter-in-law, corroborated McCants' testimony in significant part.

The purported items of impeachment evidence that Appellant faults trial counsel for failing to investigate and present are as follows: (1) McCants' prior inconsistent statements implicating Wiley in the murders; (2) a 911 call made from McCants' residence at the time of the shootings; and (3) McCants' background and character, including her previous use of aliases, her reputation for dishonesty, and her prior contact with police as a Commonwealth witness.

### A. McCants' Prior Inconsistent Statements

Appellant asserts that, on the day of the shootings, McCants [24] made statements to police implicating Wiley in the instant murders and establishing that he ran into her home *after* shots had been fired, which was inconsistent with her trial testimony that Wiley was inside her home when the shots rang out. *See* Appellant's Brief, Appendix, Volume II at 20 (wherein Sergeant McCuster indicates in a police investigation interview record that McCants told him that both Wiley and Appellant were at McCants' residence, that both men left the home, that McCants heard gunshots seconds later, and that Wiley thereafter returned to the house); *see also id.* at 19 (wherein Officer Maury reports that McCants informed him that she believed Wiley and Appellant may have committed the murders). Appellant concludes that trial counsel's failure to confront McCants with her prior inconsistent statements constituted deficient performance under *Strickland* because

24. The police reports refer to McCants as Catherine Newsuan, as that was the surname she used at that time.

the statements undermined Wiley's "alibi" and demonstrated that Wiley was in a position to have committed the crimes and had a motive to lie to police and falsely implicate Appellant. He argues that trial counsel could have had no reasonable basis for failing to impeach McCants' testimony in this regard. Finally, Appellant maintains, he was prejudiced by counsel's omission because had counsel confronted McCants with these statements, he would have exposed the lack of integrity in the Commonwealth's case.

The Commonwealth responds that Appellant's claim clearly lacks arguable merit because the evidence that he argues trial counsel should have presented actually implicates Appellant in the murders. As the police reports reveal, McCants initially informed the officers that she believed both Wiley and Appellant committed the murders. For this reason alone, the Commonwealth maintains, trial counsel cannot be deemed ineffective for failing to impeach McCants with her prior inconsistent statements. The Commonwealth further points out that trial counsel had a reasonable strategy in not impeaching McCants with her prior inconsistent statements because McCants had also given police a detailed prior consistent statement on the night of the murders, outlining how Wiley did not leave her home until after the gunshots were fired. Because McCants was not impeached, the Commonwealth asserts that it never introduced her prior consistent statement.

The PCRA court found no merit to Appellant's claim, ruling that the "alibi" that McCants provided for Wiley had nothing to do with Appellant's involvement in the shootings because the only relevant inquiry was whether Wiley witnessed the murders. PCRA Ct. Slip Op. at 13. It found reasonable trial counsel's strategy of arguing to the jury that Wiley's original statement implicating Appellant had been coerced and that his recantation at trial was truthful. *Id.* The court held that trial counsel had an interest in steering the jury away from examining Wiley's precise location at the time of the shootings, and keeping the focus on Wiley's recantation of his original statement. *Id.*

■ We agree with the PCRA court that Appellant's claim fails as trial counsel acted reasonably in declining to impeach McCants with her prior inconsistent statements because such statements implicated Appellant in the instant offense. *See Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 565 (2009) (holding that the failure to impeach a witness on a particular ground cannot constitute ineffective assistance of counsel if trial counsel had a reasonable strategy for not so impeaching).

## B. The 911 Call

Appellant asserts that trial counsel was ineffective for failing to obtain and use at trial the police department's audiotape of a 911 call reporting the shootings, which was made from McCants' residence by a female caller. Appellant asserts that in the background of the 911 call, you can hear a second female saying to another individual (purportedly, Wiley), "[d]on't run into the police." While there was some confusion as to who made the background statement at issue, Appellant asserts that he learned after the PCRA proceedings had concluded that McCants' daughter-in-law, Wilson, made the statement. Appellant argues that the background statement, "[d]on't run into the police," supports the inference that Wiley was involved in the crime, and that his involvement was apparent to Wilson. According to Appellant, this is consistent with the defense theory that it was Wiley, and not Appellant, who murdered the victims. He concludes that trial counsel's failure to secure and present the 911 tape to the jury fell below the level of reasonable performance required by *Strickland*, and that he was prejudiced thereby.

The Commonwealth counters that Appellant's claim lacks arguable merit because the 911 call had no impeachment value. It maintains that directing one not to "run into the police" does not necessarily imply criminality and, in any event, would not have been exculpatory to Appellant. Moreover, the Commonwealth points out, Wilson confirmed in her affidavit obtained for the PCRA proceeding that Wiley was inside McCants' home at the time the shootings occurred. *See* Appellant's Brief, Appendix, Volume II at 14. Thus, it main-

tains, any attempt to use Wilson's background statement recorded in the 911 call to suggest incrimination of Wiley fails.

The PCRA court denied Appellant relief on this claim. Initially, it noted that Appellant failed to meet its burden of establishing the identity of the declarant of the statement at issue.[25] Even assuming Appellant's assertions regarding the nature of the 911 call were true, it held that Appellant was not prejudiced by trial counsel's failure to present the audiotape to the jury because it would not have influenced the verdict. PCRA Ct. Slip Op. at 12. The court emphasized that a "suggestion that one not run into the police is hardly evidence of guilt or cover-up." *Id.*

 We concur in the PCRA court's conclusion that Appellant's claim fails. The claim lacks arguable merit because the 911 call lacked impeachment value as it did not serve to discredit Wilson's testimony. Wilson testified that Wiley was present inside McCants' home when the shooting occurred. The 911 call, in which Wilson warns Wiley to stay away from police, does nothing to discredit this particular assertion, and reaffirms that Wiley was, in fact, inside McCants' residence when the murders occurred. Given Appellant's previous claims in which he details Wiley's extensive previous criminal charges, it is not beyond credulity that Wilson would caution Wiley against being found near a crime-scene murder investigation. Trial counsel cannot be deemed to have provided constitutionally deficient representation based on his failure to elicit such a minor point on cross-examination. *See Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 734 (1998) (holding that trial counsel was not ineffective for failing to elicit a minor inconsistency in the witness' testimony).[26]

25. Again, Appellant did not learn that it was Wilson's voice in the background of the 911 call until after the PCRA proceedings had concluded in the trial court.

26. In a related claim, Appellant argues that the Commonwealth violated *Brady* when it failed to turn over to trial counsel the 911 audiotape. As noted, to succeed on a *Brady* claim, "a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the

## C. McCants' Background and Character

Appellant asserts that trial counsel failed to investigate the following evidence of McCants' background and character, and to use such evidence to impeach her testimony at Appellant's trial: (1) McCants' previous use of aliases; (2) McCants' "prior contacts" with police as a Commonwealth witness; and (3) McCants' reputation for dishonesty.

### 1. McCants' Use of Aliases

Appellant contends that trial counsel was ineffective for failing to impeach McCants with her previous use of aliases, instead of stipulating to such fact. The record demonstrates that trial counsel and the Commonwealth entered into a stipulation, which was read to the jury, stating that in 1975 Catherine McCants used the name Barbara Johnson; in 1979, she used the name Barbara Anderson; and in 1983, she used the name Catharine Estridge. N.T. 3/5/2001 at 140. Appellant argues that trial counsel's failure to impeach McCants with her use of aliases rendered his performance constitutionally deficient because impeachment of McCants in this regard would have demonstrated "McCants' willingness to deceive." Appellant's Brief at 38. He suggests that the "jury never had the benefit of hearing and observing McCants when she was confronted with this information." *Id.* Appellant submits that there was no reasonable basis for trial counsel's failure to cross-examine McCants on this matter. Finally, Appellant reiterates the global claim of prejudice arising from trial counsel's failure to impeach McCants with the several items of proffered evidence. He argues that had trial counsel effectively impeached McCants' testimony that placed Appellant at the scene of the crime and linked him to the crime through physical evidence, there is a reasonable probability that the outcome of the trial would have been different.

The Commonwealth argues that this claim is meritless because trial counsel acted reasonably in stipulating that

defendant." *Gibson*, 951 A.2d at 1126. We summarily reject Appellant's *Brady* claim because he has failed to demonstrate that the 911 audiotape was exculpatory to him, or that the Commonwealth suppressed it.

McCants had used different names in the past. It submits that Appellant has failed to demonstrate entitlement to relief as he has not explained how confronting McCants with her marriages and divorces, and her purported "aliases" would have discredited her testimony in any way.

Similarly, the PCRA court held that this claim was "frivolous" because Appellant "does not explain, nor can this court imagine, how confronting Ms. McCants with the aliases and thereby giving her a chance to explain them away would have helped his case." PCRA Ct. Slip Op. at 14.

We find no legal error in the PCRA court's ruling that Appellant has failed to demonstrate entitlement to relief on this claim. We, therefore, reject this claim for lack of arguable merit.

## 2. McCants' Prior Police Contacts

Appellant argues that trial counsel was ineffective for failing to impeach McCants with evidence that she acted as a Commonwealth witness in unrelated cases, which purportedly demonstrates her possible ties to the prosecution. He asserts that the prosecutor informed trial counsel during the preliminary hearing that McCants had previously testified for the Commonwealth, but that Appellant had no details regarding the extent of such contacts with the prosecution because the PCRA court denied his request for discovery on this claim. His present claim of ineffectiveness challenges trial counsel's failure to investigate such contacts in an effort to demonstrate McCants' bias toward the Commonwealth.

In response, the Commonwealth categorizes Appellant's claim as mere speculation because he has failed to demonstrate how McCants' testifying for the Commonwealth in unidentified and unrelated cases serves to impeach her testimony against Appellant in this case. It asserts that Appellant's utter failure to substantiate his claim renders it meritless.

The PCRA court concurred with the Commonwealth, finding that there was no indication that any of McCants' prior

contacts with police were related to this case. Moreover, it concluded that such evidence would not be admissible as character evidence against McCants because Pa.R.E. 608(b)(1) precludes attacks upon the character of a witness based upon specific instances of conduct of the witness. *See* Pa.R.E. 608(b)(1) (prohibiting the admission of evidence relating to specific instances of conduct of a witness unless such specific instances are otherwise admissible as prior criminal record). The court further held that even if McCants' prior contacts with police were admissible, Appellant has failed to demonstrate that trial counsel's failure to impeach McCants with such evidence prejudiced him because McCants was not an eyewitness to the crime. The PCRA court emphasized that McCants was not the only witness who placed Appellant at the scene of the crime; her daughter-in-law, Andrea Wilson, corroborated McCants' testimony. Thus, the court concluded that the outcome of the trial would not have been different had trial counsel impeached McCants' testimony with her prior police contacts.

Again, we find no error in the PCRA court's ruling. Simply put, Appellant has failed to link McCants' testimony in favor of the Commonwealth in unrelated cases with the credibility of her testimony against him in the instant case. Thus, the claim fails for lack of arguable merit.[27]

### 3. McCants' Reputation for Dishonesty

Appellant argues that trial counsel was ineffective for failing to impeach McCants with evidence of her reputation for dishonesty, which could have been demonstrated by various witnesses from whom PCRA counsel obtained declarations.

---

27. In a related claim, Appellant argues that the Commonwealth violated *Brady* by withholding evidence of McCants' prior contacts with the police. We summarily deny this claim as Appellant has failed to demonstrate the Commonwealth suppressed the evidence at issue. *See Gibson,* 951 A.2d at 1126 (holding that to succeed on a *Brady* claim "a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant"). We note that McCants provided an affidavit for this PCRA hearing and presumably could have informed Appellant's counsel, had she been asked, about the previous cases in which she testified for the Commonwealth.

*See* Appellant's Brief, Appendix, Volume II at 22, 24, 26, & 30 (wherein four relatives of Appellant assert that McCants was violent, sold drugs, and had a reputation for not telling the truth to police and others). Appellant reiterates that trial counsel had no reasonable basis for failing to impeach McCants with the aforementioned evidence, considering the significance of her testimony that linked Appellant to the physical evidence found at the crime scene. He further concludes that he was prejudiced by counsel's omission because exposing McCants' bias and dishonesty would have given the jury substantial reason to doubt her testimony, and there is a reasonable likelihood that the outcome of the trial would have been different.

The Commonwealth responds that trial counsel cannot be faulted for failing to call Appellant's relatives to demonstrate McCants' negative reputation when he has failed to demonstrate that trial counsel knew these witnesses existed, or that they were available or willing to testify. Moreover, the Commonwealth questions the admissibility of the declarations of Appellant's family members, as it finds that the declarations relate more to specific instances of McCants' conduct, which are inadmissible under Pa.R.E. 608(b)(1), than to her reputation for dishonesty.

The PCRA court rejected Appellant's ineffectiveness claim on the same basis. It found that most of the testimony that Appellant now presents would have related to specific instances of McCants' misconduct and, therefore, would have been inadmissible under Pa.R.E. 608(b)(1). It noted that because Appellant did not maintain that McCants had been convicted of a *crimen falsi* offense, evidence of specific instances of her conduct clearly would not have been admissible at trial. To the extent the declarations actually addressed McCants' reputation for dishonesty and not merely specific instances of her conduct, the PCRA court held that Appellant's ineffectiveness claim failed because he did not demonstrate that trial counsel knew that the proffered witnesses, Appellant's family members, were available and willing to testify. Finally, the court found that even if trial counsel was aware of such witnesses

and of their willingness to testify, Appellant was not prejudiced by trial counsel's failure to present such witnesses at trial.

We conclude that the PCRA court's findings are supported by the record and are free from legal error. The declarations Appellant proffers primarily address specific instances of McCants' conduct, *i.e.*, her specific acts of violence, threats of violence, or deception, which would have been inadmissible to attack her credibility under Pa.R.E. 608(b)(1). *See Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 534–35 (2005) (recognizing that Pa.R.E. 608(b) precludes the admission of specific instances of misconduct to attack a witness' character for truthfulness; while Pa.R.E. 609(a) requires an actual conviction of a crime involving dishonesty or false statement in order for a witness's credibility to be attacked with evidence of the crime). As to any remaining assertions in the declarations that actually related to McCants' reputation for dishonesty, we find dispositive that Appellant failed to establish that the four individuals who provided declarations were known or should have been known to trial counsel. *See id.*, 889 A.2d at 546 (holding that to prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, a defendant must prove: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant). To the extent that Appellant faults trial counsel for failing to investigate these witnesses, we note that the proposed witnesses were Appellant's family members, and we fail to see why Appellant, himself, could not have alerted trial counsel to their existence, rather than faulting counsel for failing to investigate the same. *See Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334, 340 (1998) (holding that "[a]ppellant's own failure to cooperate with counsel in order to apprise him of allegedly relevant information cannot now provide a basis for ineffectiveness claims.").

## VI. Ineffectiveness for Failing to Object to Detective Mangold's Testimony

Appellant argues that trial counsel was ineffective for failing to object and request a cautionary instruction during the direct examination of Detective Mangold [28] when the prosecutor's questioning gave the false impression that evidence known to the detective, but not introduced at trial, supported Wiley's statement. He further contends that trial counsel enhanced the impact of that improper testimony by eliciting Detective Mangold's personal belief in the truth of Wiley's accusations against Appellant. Appellant maintains that these combined errors violated his right to due process and his right to a fair and a reliable verdict, and thus his ineffectiveness claim has arguable merit. He relies on the following testimony:

PROSECUTOR: Did you ever show him [Wiley] any documents, any interviews from other witnesses, that were taken during the course of this investigation?

DETECTIVE MANGOLD: I didn't show him any documents, but in the statement, I confronted him, about halfway through, with some of the facts that I learned from Detective Reinhold, and from other interviews that I had read.

PROSECUTOR: What did you say to him?

DETECTIVE MANGOLD: Basically, he was lying in the beginning of his statement. He was placing himself inside his aunt's house the whole time prior to this incident, and he stated that he didn't see the shooting; he only heard it from inside, when, in fact, we knew that he had gone into the house—

DEFENSE COUNSEL: Objection, Your Honor, to "We knew."

THE COURT: Sustained.

28. As noted above, the testimony of Detective Mangold, who obtained Wiley's statement implicating Appellant in the murders, was offered to refute Wiley's trial testimony that his statement was coerced, and to demonstrate that Wiley's statement was given voluntarily and without threat of physical harm.

PROSECUTOR: So, you confronted him with certain information as to when he went into his aunt's house?

DETECTIVE MANGOLD: That's correct.

N.T. 3/5/2001 at 102–03.

Appellant recognizes that trial counsel lodged an objection, but emphasizes that he failed to request a cautionary instruction prohibiting the jury from considering any references to "extra-record" sources of information implicating Appellant's guilt. He maintains that trial counsel compounded this error when, later in his cross-examination of Detective Mangold, trial counsel himself questioned the detective about how he confronted Wiley with other information he had learned about the incident. *Id.* at 122 (wherein Detective Mangold responds, "I confronted him with this halfway through the interview, and I told him, 'You are not telling me the truth, and you better get on board with it,' and he did"). Appellant further complains that trial counsel repeated this error on redirect when he asked Detective Mangold about his basis of knowledge of the crime at the time of the interrogation. In support of this assertion, Appellant cites the following exchange:

DEFENSE COUNSEL: When you told [Wiley] about these inconsistencies that you saw [in Wiley's initial version of how the shooting occurred], you said that you are not sure what you told [Wiley]. At that time, did you have any information as to the actual way that the shooting went? Do you understand what I am saying? Did you suggest to [Wiley] that you had information as to where [Appellant] was, and where Mr. Wise was, and where Rodney Walters was, at the time that they were shot?

DETECTIVE MANGOLD: I didn't give him details and facts about the case. I indicated to him that I had spoken to his godmom, that I had been to her home, and that I had spoken to other people who witnessed parts of this. That is what I confronted him with, **that it was impossible for him not to have seen this.**

DEFENSE COUNSEL: Objection, Your Honor; move to strike.

THE COURT: That is just what he said. Jurors, it is not whether it is true or not; it is just what he told him. *Id.* at 129–30 (emphasis added). Despite trial counsel's objection and the trial court's cautionary instruction, Appellant argues that counsel was nevertheless ineffective because Detective Mangold's testimony that "it was impossible for [Wiley] not to have witnessed the shooting" suggested to the jury that there was additional evidence not presented at trial that supported the version of events set forth in Wiley's statement to police. *Id.*

Finally, Appellant submits that trial counsel made matters worse by eliciting the following testimony from Detective Mangold regarding his personal opinion of the credibility of Wiley's accusations against Appellant.

DEFENSE COUNSEL: So, you think that [Wiley] is lying?

DETECTIVE MANGOLD: I think that he took part in the planning of these Murders. I don't think that he is lying. I think that he took part in the planning and chickened out at the last second because he was on his godmother's block, and he didn't want to be seen taking part in this.

DEFENSE COUNSEL: That is what he said in the statement, is that right?

DETECTIVE MANGOLD: I believed him.

DEFENSE COUNSEL: What you believe doesn't count, is that right?

DETECTIVE MANGOLD: No sir.

*Id.* at 132. Regardless of trial counsel's clarification that what the detective personally believed was irrelevant, Appellant reiterates that this questioning constituted ineffectiveness because it elicited improperly Detective Mangold's opinion regarding the veracity of Wiley's statement.

As to remaining prongs of the ineffectiveness standard, Appellant maintains that trial counsel's strategy was unreasonable, and that he was prejudiced by trial counsel's performance because the jury's assessment of the credibility and reliability of Wiley's statement to police was fundamental to

its verdict. Hence, Appellant maintains, there is a reasonable likelihood that had trial counsel taken the appropriate actions, the jury's assessment of Wiley's statement, and its verdict, would have been different.

The Commonwealth responds that Appellant's claim lacks arguable merit because the record clearly demonstrates that trial counsel, in fact, objected to the statements at issue, that such objections were sustained, at least in part, by the trial court, and that the trial court expressly cautioned the jury against accepting as true Detective Mangold's statement that it was impossible for Wiley not to have observed the murder. Moreover, it submits that Detective Mangold's testimony was proper because it explained the actions he took that led Wiley to change his story regarding what occurred on the night of the shootings. *See Commonwealth v. Hamilton,* 543 Pa. 612, 673 A.2d 915, 918 (1996) (holding that evidence of what other individuals reported to a policeman was admissible, not for the truth of the matter asserted, but to show the information upon which the police acted). Because the trial court made certain that the jury understood the purpose for which the evidence was introduced, the Commonwealth concludes that there is no basis for Appellant's ineffectiveness claim.

The PCRA court denied relief on this claim. It held that trial counsel did object when Detective Mangold attempted to explain his knowledge of the events on the day of the murder, and the trial court sustained this objection. PCRA Ct. Slip Op. at 10. The court emphasized that trial counsel again objected when the detective attempted to explain the inconsistencies about which he confronted Wiley, after which the trial court expressly instructed the jury that Detective Mangold's opinion should not be accepted as fact. *Id.* The PCRA court further found "frivolous" Appellant's claim that trial counsel was ineffective for not objecting to Detective Mangold's testimony that he believed Wiley was telling the truth when he implicated Appellant. *Id.* at 11. The court reasoned that Detective Mangold's belief that Appellant was guilty, which he held prior to interviewing Wiley, supported the defense theory that Wiley had no choice but to implicate

Appellant in the murder. *Id.* It asserted that trial counsel used this testimony to Appellant's advantage in the closing argument when he argued that Wiley was forced to tell the truth, "as the detective believed the truth to be, and if he didn't give that truth, [Wiley] would still be down there." *Id.* (citing N.T. 3/6/2001 at 15–16).

The PCRA court's conclusion is supported by the record and free of legal error. Considering that trial counsel objected to the statements at issue, and the trial court cautioned the jury, albeit briefly, against considering the detective's testimony for the truth of the matter asserted, there remains no factual predicate upon which to base an ineffectiveness challenge. Thus, the claim fails for lack of arguable merit. We decline to deem trial counsel's performance constitutionally deficient when Appellant has failed to articulate what further action he should have taken in this regard.

## VII. Ineffectiveness for Failing to Request a Corrupt Source Charge

Appellant argues that trial counsel was ineffective for failing to request a corrupt source charge in connection with the trial testimony of Wiley. He maintains that the jury should have been informed that Wiley is a corrupt and polluted source because he was an accomplice to the murders, and, therefore, his testimony should be viewed with caution. Although he concedes that Wiley was not charged as an accomplice, Appellant argues that there is arguable merit to his ineffectiveness claim because the evidence of record permitted the inference that Wiley was an accomplice. In support of this assertion, he points out that the police initially viewed Wiley as a suspect. He further notes that Wiley fled from McCants' residence immediately after the shootings and made an unsolicited statement to a neighbor, indicating that he had nothing to do with the crimes. Finally, he asserts that Detective Mangold's testimony, that he believed Wiley took part in the planning of the murders, supported an inference that Wiley acted as an accomplice.

Regarding the reasonable basis prong of the ineffectiveness standard, Appellant submits that a corrupt source charge regarding Wiley could only have assisted the defense, and "there could be no reason, other than neglect, for counsel to have failed to request the instruction." Appellant's Brief at 54. Finally, Appellant maintains that he satisfied the prejudice prong because there is a reasonable probability that had a corrupt source charge been given, the jury would have had a legal basis to reject Wiley's trustworthiness, and would not have credited Wiley's statement to police, which was the primary evidence against him.

The Commonwealth counters that trial counsel cannot be deemed ineffective for failing to request a corrupt source charge because Appellant was not entitled to such instruction. It emphasizes that a corrupt source charge is only required where the evidence is sufficient to present a jury question as to whether the Commonwealth witness was an accomplice. Here, the Commonwealth maintains, there is absolutely no evidence that Wiley assisted in the crime. It asserts that the record supports nothing more than Detective Mangold's theory that Wiley may have participated in the planning of the murders. However, the Commonwealth points out that there was no evidence in support of the detective's theory. It reiterates that Wiley testified that he knew nothing about the crime, and his statement implicating Appellant did not additionally implicate Wiley, himself, in any way. Instead, Wiley indicated in his statement to police that he declined Appellant's invitation to take part in the shootings.

The PCRA court rejected Appellant's claim on a similar basis. It held that the ineffectiveness claim fails because "Wiley has not been charged as an accomplice, and there is no evidence to permit an inference that he was an accomplice." PCRA Ct. Slip Op. at 19. Acknowledging that Wiley's statement indicated his awareness of Appellant's intent to rob the victim, the court found that such knowledge was insufficient to support an inference that Wiley was an accomplice. *Id.* at 19–20 (citing *Commonwealth v. Carey*, 293 Pa.Super. 359, 439 A.2d 151, 158 (1981) (holding that an accomplice is one who

"knowingly and voluntarily cooperates with or aids another in the commission of a crime")). It further dismissed Appellant's reliance on Detective Mangold's "theory" that Wiley may have participated in the planning of the crime as "unsupported elsewhere in the record." *Id.* at 20.

██ The PCRA court's determination is supported by the record and free of legal error. This Court has held that it "is well established that, in any case in which an accomplice implicates the defendant, the trial court should instruct the jury that the accomplice is a corrupt and polluted source whose testimony should be considered with caution." *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1181 (1999); *Commonwealth v. Chmiel*, 639 A.2d at 13. The charge is warranted where the evidence is sufficient to present a jury question with respect to whether the Commonwealth's witness is an accomplice. *Williams*, 732 A.2d at 1181. An accomplice is one who aids or agrees or attempts to aid such other person in planning or committing the offense. 18 Pa.C.S. § 306(c)(1)(ii).

Here, as the PCRA court held, there was no evidence that Wiley assisted or aided Appellant in the planning or execution of the murders. Rather, Wiley testified that he declined Appellant's previous request for him to join in the commission of the offenses. While Appellant argued to the jury that Wiley may have been the perpetrator instead of Appellant, and Detective Mangold expressed his belief that Wiley may have been involved in the planning stage, there was no evidence presented supporting either of these notions. Further, contrary to Appellant's assertions, police suspicion of Wiley and Wiley's unsolicited comment that he had nothing to do with the shootings are insufficient to present a jury question as to whether Wiley was an accomplice. Thus, the ineffectiveness claim fails for lack of arguable merit. Moreover, we fail to see why trial counsel would have requested an instruction informing the jury that Wiley is a corrupt and polluted source whose testimony should be view with great caution. As noted, Wiley testified favorably for the defense at trial by repudiating his previous statement implicating Appellant. The reason-

able defense strategy presented was to suggest to the jury that Wiley's trial testimony was truthful and that his previous statement to police had been coerced.

## VIII. Ineffectiveness for Stipulating that Appellant Possessed a Large Sum of Money When Arrested

Appellant argues that trial counsel was ineffective for stipulating that on January 21, 1999, when he was arrested for the murders of Wise and Walters that occurred nearly one week before, he had $1,169.00 in cash in his possession. N.T. 3/5/2001 at 137. He maintains that while the Commonwealth's theory of the case was that he murdered the victims during the commission of a robbery, there was no evidence that any money or goods were actually stolen. To the contrary, he asserts, at the time of the victims' deaths, $184 was found in Wise's pocket, and $318 was found on Walters. Appellant contends that despite the absence of proof of a robbery, trial counsel not only failed to object to the Commonwealth's presentation of irrelevant and prejudicial evidence of a substantial amount of money found on him at the time of his arrest, but stipulated to such fact. He claims that based on the passage of time between the murders and his arrest, there was no rational basis upon which the jurors could infer that the cash found on Appellant at the time of his arrest was stolen from the victims. Nevertheless, Appellant asserts, in her closing argument, the prosecutor urged the jury to make such a connection. The prosecutor stated as follows:

We have put in evidence, and stipulated to evidence, that this Defendant was found with $1,100 in his pocket. Mr. Wise still had $300 in his pocket, I believe, and Rodney Walters also had a substantial sum. Rodney Walters and Milson Wise were engaged in numbers running, engaged in what is an illegal activity. They were making money from that. You heard that they had various numbers on them. Other people talked about paying them for their numbers.

Did Milton Wise have a large sum of money with him that day that was not in his pockets? I submit to you that the

inference is that he probably did, but it doesn't really matter. It doesn't really matter if you believe that the Defendant was out on that street, after telling Eric Wiley that he was going to get Milton Wise and Rodney Walters, after telling Eric Wiley that he was going to jam, to rob, Milton Wise and Rodney Walters [ . . . ].

N.T. 3/06/01 at 52–52.

Appellant submits that the admission of this irrelevant and prejudicial evidence, as stipulated by trial counsel, and which was emphasized in the prosecutor's closing argument, denied him of his right to a fair trial and a reliable verdict, thus lending arguable merit to his claim of trial counsel ineffectiveness. Regarding the reasonable basis prong of the ineffectiveness test, he argues that because "there is no conceivable nonprejudicial use to which the jury could put this evidence, counsel's stipulation, instead of an objection to the admission of the evidence, was not reasonably designed to further his client's interests." Appellant's Brief at 59. Finally, Appellant contends that he was prejudiced by trial counsel's stipulation because, had counsel objected to the admission of the evidence, there is a reasonable likelihood that the outcome of the trial would have been different.

The Commonwealth responds that there is no arguable merit to Appellant's claim that trial counsel was ineffective for entering into the stipulation because the evidence was admissible, and any defense objection would have been futile. It submits that it was not required to provide "conclusive proof" that the cash came from the robbery in order for the evidence to have been admitted. Commonwealth's Brief at 50. According to the Commonwealth, it only had to show sufficient circumstances to justify an inference establishing a material element of a crime. *See Commonwealth v. Treiber*, 582 Pa. 646, 874 A.2d 26, 32 (2005) (holding that evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact). The Commonwealth contends that because the jury could reasonably infer that the substantial cash found

on Appellant six days after the incident came from the robbery, the evidence was admissible, and trial counsel had no basis to object. It emphasizes that lack of proof that Appellant obtained the large amount of cash from the robbery of Wise and Walters goes to the weight of the evidence, and not its admissibility. Trial counsel highlighted this point, the Commonwealth asserts, in his closing argument when he alleged that any connection between the money and the robbery was speculation, and the fact that the victims still had money in their pockets after the shootings militated against a finding of robbery. N.T. 3/6/01 at 11. Moreover, the Commonwealth asserts, because trial counsel acted reasonably by stipulating to such fact instead of affording the Commonwealth the opportunity to emphasize it *via* live testimony, Appellant has failed to demonstrate a lack of reasonable basis for trial counsel's performance in this regard.

The PCRA court agreed with the Commonwealth that Appellant's ineffectiveness claim lacked arguable merit, and held that there was "more than enough evidence to support a reasonable inference that the money [recovered from Appellant upon arrest] was the robbery proceeds." PCRA Ct. Slip Op. at 18. It echoed the Commonwealth's sentiments that a jury could reasonably infer that the large sum of cash was the proceeds of the robbery, and that the lack of conclusive proof went to the weight, rather than admissibility, of the evidence. The court concluded that because the evidence was clearly admissible, trial counsel had no basis to object to its admission, and his failure to do so cannot support a finding of ineffectiveness.

We find no error in the PCRA court's determination. The evidence at trial established that the murder victims "ran numbers" and were likely to possess large amounts of cash. Thus, the fact that Appellant told Wiley that he wanted to rob the victims for this reason, and was arrested six days after the murders with $1167 on his person, supports an inference that the money he possessed at the time of his arrest was, in fact, the proceeds of the robbery. *See Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 923 (2008) (holding that evidence is

relevant if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact). Because the evidence to which trial counsel stipulated was relevant to a material fact, *i.e.*, Appellant's commission of a robbery, it was admissible. As such, trial counsel acted reasonably by stipulating to the fact, rather than having the Commonwealth present live testimony of the same. *See Commonwealth v. Saxton*, 516 Pa. 196, 532 A.2d 352, 357 (1987) (holding that trial counsel was not ineffective, and instead made a reasonably-based strategic choice when he stipulated to evidence to avoid the more harmful impact of admission of the evidence on cross-examination of the defendant).

### IX. Ineffectiveness for Failing to Object to Prosecutorial Misconduct

Appellant argues that trial counsel was ineffective for failing to object to the following improper comments made by the prosecutor during summation: (1) misstating stipulations regarding the lack of DNA evidence; (2) vouching for Detective Mangold's credibility and making misleading arguments; (3) vouching for the truthfulness of Wiley's statement implicating Appellant in the murders; (4) denouncing Wiley's trial testimony, which repudiated his previous statement to police; (5) misstating facts regarding Wiley's view of the offense; (6) assuring that Wiley was not the killer; (7) vouching for McCants' credibility; and (8) misstating the law regarding the robbery charge. As detailed below, we find that each of these claims, which challenge nearly every aspect of the prosecutor's closing argument, lack arguable merit.

We begin by reviewing the relevant general legal principles, and then address each of Appellant's sub-issues. A claim of ineffective assistance grounded in trial counsel's failure to object to a prosecutor's conduct "may succeed when the petitioner demonstrates that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a

constitutional interest such as due process." *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 685 (2009) (quoting *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 29 (2008)). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (internal quotation marks omitted)). "The touchstone is fairness of the trial, not the culpability of the prosecutor." *Id.*

We further reiterate that a "prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury." *Id.* at 687. The court must evaluate a prosecutor's challenged statement in the context in which it was made. *Id.* Finally, "[n]ot every intemperate or improper remark mandates the granting of a new trial;" *id.*, "[r]eversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Id.*

### A. DNA Evidence

The first instance of alleged prosecutorial misconduct involves the prosecutor's description of a stipulation entered into by the parties regarding the proffered testimony of a Philadelphia Crime Lab technician who examined two ski hats found at the crime scene, but found no DNA evidence that could be conclusively matched to any individual. *See* N.T. 3/5/2001 at 135–137. As background information relating to this claim, we note that in his summation to the jury, trial counsel emphasized the absence of DNA evidence linking Appellant to the crime. Specifically, trial counsel suggested that to determine whose hat was found at the scene, the Commonwealth could have done more than present McCants' testimony identifying one of the hats as belonging to Appellant; it could have had

the hats analyzed. N.T. 3/6/2001 at 9. Trial counsel urged the jury to question this lack of DNA evidence in its deliberations. *See id.* at 9–10.

In response, the prosecutor stated, in relevant part, as follows:

I will address one point right away. Perhaps the only mistake that we made in this case, or one of the mistakes that we made in this case, is that we didn't put the lab person on from the Criminalistics Laboratory.

Counsel tells you that we didn't test the physical evidence in this case, but there was a stipulation in this case that those hats, which were taken from the scene, were taken to the Philadelphia Criminalistics Laboratory, and tested by DNA analysis [. . .].

\* \* \*

The laboratory technician tested the hat, tested a hair that was in the hat, that was found in the hat, and on neither of those two items could they develop a DNA pattern that could be compared to anyone.

The Commonwealth did not fail to compare the Defendant's DNA to that hat. *It was impossible, based on scientific evidence.* There was nothing to compare it to. There was no DNA that could be developed.

*Id.* at 19–20 (emphasis added).

Appellant argues that these comments constituted prosecutorial misconduct to which trial counsel should have objected. The statements exceeded the fair bounds of the record, he asserts, because the stipulation only provided that the Commonwealth's expert was unable to retrieve a DNA sample, and not that it was "scientifically impossible" to do so. Appellant further challenges the prosecutor's suggestion that the lab technician's testimony would support such view. Thus, he concludes there is arguable merit to his ineffectiveness claim.

In a global argument relating to all of his several claims alleging ineffectiveness of trial counsel for failing to object to prosecutorial misconduct, Appellant asserts that trial counsel had no reasonable basis for "failing to object and seek corrective measures from the court." Appellant's Brief at 67. He

submits that no countervailing considerations weighed in favor of allowing the prosecutor's remarks to go "unchecked." *Id.* Concerning the prejudice prong of the ineffectiveness test, Appellant contends that the prosecutor's arguments bolstered the Commonwealth's case, misdirected the jury, and unfairly influenced the jury's assessment of the evidence. He asserts that had trial counsel objected, there is a reasonable likelihood that the trial court would have sustained the objections and cautioned the jury to disregard the improper comments. Appellant concludes that, but for counsel's inaction in this regard, there is a reasonable likelihood that the outcome of the trial would have been different.

The Commonwealth responds that Appellant's claim lacks arguable merit because the prosecutor's comments were in fair response to trial counsel's unwarranted criticism of the Commonwealth for failing to utilize DNA analysis on the hats found at the scene. It asserts that the stipulation clearly established that the hats had, in fact, been analyzed, but that no DNA evidence could be recovered.

The PCRA court agreed with the Commonwealth, and held that the claim failed "because the complained-of-remarks were proper responses to trial counsel's summation, which mischaracterized the stipulation to the DNA evidence." PCRA Ct. Slip Op. at 23. The court concluded that the prosecutor's statements indicating that the hats had been analyzed, but that no DNA could be developed, were accurate as they were supported by the record, and were a proper response to trial counsel's attacks on the DNA evidence in summation. *Id.* Further, the court noted in the aggregate that, even assuming there was merit to this and the remaining claims of prosecutorial misconduct, Appellant would still not be entitled to relief because the court instructed the jury that the statements of counsel are not evidence. *Id.* at 28 (citing N.T. 3/6/2001 at 2–3).

The PCRA court's conclusions are supported by the record and are free of legal error. There is no arguable merit to Appellant's claim that trial counsel was ineffective for failing to object to the prosecutor's comments because the prosecutor

did not misstate the stipulation. The prosecutor accurately indicated that the Commonwealth conducted DNA testing, but that no DNA could be developed.[29] Rather, it was trial counsel who misstated the stipulation by suggesting that the Commonwealth did not submit the hats found at the murder scene to DNA analysis. The prosecutor responded fairly by clarifying that DNA testing had been performed, but that insufficient DNA samples were recovered to make conclusive findings. *See Commonwealth v. Simpson*, 562 Pa. 255, 754 A.2d 1264, 1278 (2000) (recognizing that a prosecutor is permitted, during closing arguments, to make a fair response to misleading statements made by defense counsel).

## B. Detective Mangold

Appellant next argues that trial counsel was ineffective for failing to object when the prosecutor, in his summation,

**29.** The stipulation the prosecutor read to the jury at trial, which was confirmed by trial counsel on the record, stated:

Mr. [Kevin] Knox [a Criminalistics Technician with the Philadelphia Crime Lab] would testify that he tested portions of the hat, the solid black hat, and that he could not get areas of perspiration that he thought would check positive for DNA, because—that is contained in fluids in the body, and he could not get any DNA samples from the hat that he tested to compare it to anybody, and no results were found.

He would say that he tested a hair fragment from the same knit hat, but that the hair fragment had no root on it, and again, he was unable to get any sample from that hair fragment to use and contrast with anybody else.

There were no DNA samples taken from that hair, or from that hat.

With respect to Hat Number–2, there was an area of possible perspiration that he cut out, that he took, and he would say that there are six possible matches that they can make, when comparing DNA. He got three of those six from his test, and based on that, he would say that he cannot—the way that he would put it is that he cannot exclude Milton Wise [the victim] as the person who deposited the perspiration on the hat because three of his six are a match, but not all. So, you cannot exclude Mr. Wise, but the three that he got were a match.

\* \* \*

There was also a hair, a light brown hair, with a root, again, from that same hat with the Reebok on it, and that he got two of the six tests from that, but again, he could not exclude Milton Wise as the person who deposited that hair on there, based on his comparison. N.T. 3/5/01 at 135–37.

vouched improperly for Detective Mangold, and made misstatements of law and fact. As noted above, Detective Mangold obtained the statement from Wiley implicating Appellant in the shootings, and testified at trial that Wiley gave his statement voluntarily. During closing arguments, trial counsel argued to the jury that Wiley only gave the statement to police to avoid being charged with the murders. N.T. 3/6/2001 at 15–17. In support of the arguable merit prong of his ineffectiveness claim, Appellant contends that the prosecutor responded to his argument inappropriately as follows:

Let's talk about what happens after Eric Wiley is transported to Homicide. Well, Detective Mangold—Counsel makes a big thing about this, Detective Mangold was suspicious that Eric Wiley was involved, and that he thought that he was part of it. Detective Mangold told you quite frankly that he thought that Eric Wiley was part of it. You heard a bit about the statement, and you can understand why he thought that. I will argue to you in a bit about what in the statement leads to that conclusion, but he is someone who— Detective Mangold is someone who cannot keep that a secret, that he thinks that Eric Wiley may have been involved in this because—what do we know?

Detective Mangold has to give Eric Wiley his *Miranda* Warnings when Eric Wiley starts that interview. Detective Mangold, by law, has to start out basically indicating to Eric Wiley: I am not exactly sure what your participation is, but it is possible that you are a part of this, and I have to give you these *Miranda* Warnings.

Detective Mangold has to do that, by law, because if Eric Wiley were to turn around and confess to something, he has to be able to use that and show that he gave his Constitutional Warnings. So, Detective Mangold has to start out, by law, kind of tipping his hand to Eric Wiley: Gee, you are not quite the regular witness that we might have in here who is just on the street, a bystander.

N.T. 3/6/2001 at 23–24. Appellant submits that trial counsel should have objected to these comments because the prosecutor bolstered Detective Mangold's testimony by emphasizing

his honesty and professionalism, suggested improperly that Wiley was not in custody when he gave his statement implicating Appellant, and misstated the law by indicating that *Miranda* warnings are necessary under circumstances that arise outside of custodial interrogation.

In response, the Commonwealth asserts that Appellant's claim fails for lack of arguable merit because the challenged remarks have nothing to do with Detective Mangold's credibility or professionalism, and any possible misstatement of *Miranda*[30] as applied to Wiley is completely unrelated to Appellant's guilt. The Commonwealth maintains that the prosecutor's comments were mere responses to trial counsel's argument that Wiley's statement was coerced, and were intended to explain Wiley's actions, *i.e.,* that he did not immediately implicate Appellant, even though Wiley was specifically informed that he may be a suspect in the instant offenses.

█ The PCRA court agreed with the Commonwealth and denied relief on this claim. The court held that trial counsel had no basis to object because the prosecutor's comments constituted fair argument. Rather than vouching for Detective Mangold's credibility, the court characterized the prosecutor's remarks as merely identifying the evidence and inferences from the detective's testimony. Regarding the prosecutor's purported misstatement of *Miranda* law, the PCRA court found this component of the claim to be "frivolous, as *Miranda* law was not at issue in this case, and the alleged misstatement could not have prejudiced the jury." PCRA Ct. Slip Op. at 25.

The PCRA court's conclusions in this regard are supported by the record and free of legal error. Upon close examination of the challenged remarks, we find that Appellant's claim lacks a factual basis as the prosecutor's comments do not address the trustworthiness of Detective Mangold's testimony. Asserting that the detective lawfully fulfilled his professional duties during his interrogation of Wiley does not speak to the

**30.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

truthfulness of the detective's testimony at trial. We further agree that any reference to *Miranda* law as it applied to Wiley is wholly irrelevant to Appellant's guilt. As trial counsel had no basis to object to the prosecutor's comments, we deny this claim for lack of arguable merit.

## C. Wiley's Statement

Appellant argues that trial counsel was ineffective for failing to object when the prosecutor exceeded the bounds of the evidence and vouched for the truthfulness of Wiley's statement. He relies on the following comments by the prosecutor wherein, Appellant asserts, the prosecutor improperly and repeatedly referred to how Detective Mangold got the "truth" out of Wiley by using reliable interrogation techniques.

Now, remember: Eric Wiley has a guilty conscience because he knows that he was out on the street; he knows that he has information about these Murders, but the only power, the only technique that Detective Mangold can use to help Eric Wiley, to get a statement from Eric Wiley, is to try to give Eric Wiley the impression that he, Detective Mangold, has information, because otherwise—remember: Eric Wiley knows what he knows. He knows that he has information about the Murders. He knows that he talked to the Defendant about planning the Robbery. He knows that he had two conversations with the Defendant about the Robbery, so he has a guilty conscience, but he will not come in there and just start telling the detective everything that he know unless he thinks that the detective has information.

\* \* \*

Let's put this straight out on the table, ladies and gentlemen: I submit to you that you cannot believe the lies that Erie Wiley told in this courtroom about how that statement took place, and believe Detective Mangold, because Detective Mangold tells you: "I did not suggest any details to Eric Wiley."

\* \* \*

Detective Mangold is a professional. He wants to tell you how the statement developed, how it developed at each

stage. He had to give a little bit, push a little bit; tell him: We have information that is inconsistent with what you are telling us, to try to draw out more truth from Eric Wiley. Perhaps, at the end, it is not quite all of the truth, not all of the truth about what happened that day, but as much truth as Detective Mangold could get. [ . . . ] That is why all of this is preserved in this statement.

N.T. 3/6/2001 at 24–27.

The Commonwealth responds that there is no arguable merit to Appellant's ineffectiveness claim because a prosecutor may argue issues of credibility where the defendant attacked the credibility of the Commonwealth's witness. *See Commonwealth v. Gwaltney*, 497 Pa. 505, 442 A.2d 236, 240 (1982) (holding that the prosecutor's remarks concerning the credibility of the Commonwealth witness did not warrant reversal where motivated by, and commensurate with, defense attacks on a witness' credibility). It maintains that in the instant case, the credibility of Wiley's statement to police was central to the defense and the prosecution. Because the defense argued that Wiley's statement should not be believed because it was coerced by the police, the Commonwealth maintains that the prosecutor could fairly comment that "police had to draw Wiley out, until they eventually elicited the truth." Commonwealth's Brief at 58.

While it did not address the particular excerpt cited by Appellant, the PCRA court held that the prosecutor did not improperly vouch for her witnesses. PCRA Ct. Slip Op. at 25. We agree, and conclude that Appellant is not entitled to relief on this claim. Generally, it is improper for counsel to express an opinion regarding the credibility of a witness. *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1034 (1996). "However, a prosecutor's remark regarding the credibility of a witness for the Commonwealth does not constitute reversible error if it is a reasonable response to a prior attack on the credibility of that witness by the defense." *Id.* Here, as the Commonwealth cogently noted, the crux of the case was the credibility of Wiley's statement to police that implicated Appellant in the murders, and trial counsel vigor-

ously argued that such statement was false. The challenged remarks at issue here directly addressed the defense's attack on Wiley's statement, and, thus, were permissible. *See Commonwealth v. Natividad*, 595 Pa. 188, 938 A.2d 310, 324 (2007) (holding that a prosecutor may respond to a defendant's attacks on a witness' credibility).

We reached a similar result in *Rios*, where the defendant challenged a Commonwealth witness' credibility concerning her identification of the defendant as one of the perpetrators of the murder. In response, the prosecutor commented on the identification testimony as follows: "that's a mark of the truth. She is not trying to make stuff up to make the case better. She is telling the truth of what she knows." *Rios*, 684 A.2d at 1034. In rejecting the defendant's claim that the prosecutor improperly gave his personal opinion that the identification witness had told the truth, this Court held that the prosecutor's comments "were a reasonable response, in both scope and force, to trial counsel's attack on [the witness'] credibility." *Id.* We reach the same conclusion here. Because the prosecutor's comments were permissible, Appellant's ineffectiveness claim fails for lack of arguable merit. *See Commonwealth v. Small*, 980 A.2d at 570 (holding that counsel cannot be ineffective for failing to raise a meritless claim).

## D. Wiley's Trial Testimony

Appellant next argues that trial counsel was ineffective for failing to object to the prosecutor's statements during closing argument wherein she referred to Wiley's trial testimony as a "lie." *See* N.T. 3/6/01 at 30 (wherein the prosecutor states, "think about some of the other lies that [Wiley] told you.... These are his lies, ladies and gentlemen, I submit to you, and what he chooses to lie about specifically, on the stand, tells you more about the truth of that statement than anything else could ..."). Unlike his previous claim, which alleged that the prosecutor expressed improperly her opinion regarding the credibility of a witness, this claim is based upon the prosecutor's purported attempt to lessen her burden of proof. Appellant submits that the prosecutor suggested to the jury that

Wiley's trial testimony repudiating his prior statement to police was a lie, and that such lie should serve as proof of the accusations Wiley made against Appellant in his prior statement. He relies on our decision in *Commonwealth v. Torres*, 564 Pa. 219, 766 A.2d 342 (2001), which held that "disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact." *Id.* at 345 (citing *Commonwealth v. Graham*, 528 Pa. 250, 596 A.2d 1117, 1118 (1991)).

■ The Commonwealth does not respond to this particular component of the claim, possibly because Appellant's argument consists of only a few sentences in his brief. *See* Appellant's Brief at 64. The PCRA court, however, expressly rejected this contention, finding that the prosecutor did not mislead the jury regarding Wiley's testimony; thus the ineffectiveness claim failed for lack of arguable merit. The court held that our decision in *Torres* did not render the prosecutor's reference improper because that case is "easily distinguishable." PCRA Ct. Slip Op. at 27. The court recognized that *Torres* did not involve a challenge to a prosecutor's comment, but rather concerned whether there was sufficient evidence to support a conviction for simple assault where the defendant had asserted a claim of self-defense. It interpreted *Torres* to hold that a fact-finder's disbelief of a defendant's claim of self-defense was not a substitute for the proof the Commonwealth was required to provide to disprove a claim of self defense. PCRA Ct. Slip Op. at 27. As such, the PCRA court held that *Torres* has no application here, where Appellant is challenging the prosecutor's characterization of Wiley's trial testimony as "lies."

The PCRA court's conclusion in this regard is sound and free of legal error. We are not persuaded that the prosecutor's reference to Wiley's trial testimony as a "lie" served to lessen the Commonwealth's burden of proof. Because the record does not support Appellant's suggestion in this regard, his ineffectiveness claim fails for lack of a factual basis. The PCRA court properly interpreted our decision in *Torres*, and found such case to be wholly inapplicable to Appellant's under-

lying claim of prosecutorial misconduct. Unlike *Torres,* the prosecutor in the instant case was not suggesting that disbelief of Wiley's trial testimony substituted as proof that Appellant committed the instant murders. Rather, the Commonwealth relied on additional independent evidence of record that suggested that Appellant was the perpetrator.

### E. Wiley's View

Appellant further challenges trial counsel's failure to object when the prosecutor allegedly misstated, without support in the record, that Wiley was able to see the crime from McCants' doorway. He relies on the following remarks:

> Eric Wiley does not ever once say to you: I was at the door the way everyone tells you and I just couldn't see it because of the van. He doesn't say that because that didn't happen. It wasn't blocking his vision [ . . . ]. Instead, the only way that he can try and convince you that he didn't see that shooting is to move himself away from the door.

> Remember, again, that where he is standing is at the top of the steps. He is looking down and across, not only across, and he has the advantage of height, as well, where he is standing in that doorway.

N.T. 3/6/2001 at 39. Appellant maintains that neither the defense nor the prosecutor ever asked Wiley whether his view was obstructed by the van. Thus, he concludes, the prosecutor went beyond the evidence when she commented that the van parked in front of McCants' residence did not block Wiley's view of the shooting.

The Commonwealth responds that Appellant's ineffectiveness claim fails for lack of arguable merit because the prosecutor's comments constituted a fair response to the defense's closing argument. It asserts that trial counsel argued that Wiley could not have observed the shooting because a van parked in front of McCants' residence blocked his view. *See* N.T. 3/6/2001 at 17 (wherein trial counsel asserted that "there is no way, unless [Wiley] climbed onto the top of the railing . . . that he could have seen over that van . . ."). The prosecutor was permitted to respond, the Commonwealth submits,

that if Wiley's disavowal of his statement were true, he could simply have testified that the van had blocked his view, rather than insisting that he had never been near McCants' doorway at the time of the shooting. It concludes that trial counsel "undoubtedly realized that the prosecutor was merely responding to the argument he had just made, and that an objection, therefore, would be pointless." Commonwealth's Brief at 62.

 The PCRA court agreed with the Commonwealth that the prosecutor made the challenged remark in response to trial counsel's argument that the van would have obstructed Wiley's view of the crime. PCRA Ct. Slip Op. at 27. The court concluded that this was a reasonable inference from the evidence, and, hence, a proper argument. Once again, we find that the PCRA court's ruling is supported by the record and free of legal error. Trial counsel argued to the jury that Wiley's statement to police was false because he could not have witnessed the crime due to the fact that a van obstructed his view from McCants' doorway. N.T. 3/6/2001 at 17. The prosecutor was, therefore, permitted to emphasize that Wiley did not assert an obstructed view when he was repudiating his statement at Appellant's trial. *See Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 808 (2007) (holding that a prosecutor may make all reasonable inferences that find support in the evidence). As the prosecutor's comments were not improper, trial counsel cannot be deemed ineffective for failing to object.

### F. Wiley's Innocence

Appellant next argues that the prosecutor improperly assured the jury that Wiley could not have been the killer. He cites the following statement from the prosecutor's closing argument:

If there is one thing that is clear in this case, no matter what the Defense Attorney wants you to believe about Eric Wiley, ladies and gentlemen—and again, it is for you to decide, but Eric Wiley was in that house at the time that the shots were fired.

N.T. 3/6/2001 at 36. His entire argument consists of the following statement, "although the prosecutor insisted that Wiley lied at trial, and even though she acknowledged that the police statement might not truthfully have recounted his own participation, she adamantly assured the jury that Wiley could not have been the killer." Appellant's Brief at 65.

The Commonwealth responds that Appellant's "bare-bones claim" does not warrant PCRA relief because the prosecutor's argument was framed by references to evidence that Wiley was in the house when the fatal shots were fired. Accordingly, it maintains, because the challenged comment was a reasonable inference from the evidence, it afforded counsel no basis for objection, and the ineffectiveness claim fails for lack of merit.

■ The PCRA court agreed, and concluded that the prosecutor's comments that Wiley was inside the house when the shooting occurred were supported by the testimony of McCants, her daughter-in-law who was present in McCants home at the time of the shooting, and Wiley, himself. This claim warrants no further elaboration as the PCRA court's reasoning in this regard is supported by the record, and is free of legal error. *See Rios,* 920 A.2d at 808 (permitting a prosecutor to make all reasonable inferences supported by the evidence).

### G. McCants' Testimony

Appellant next challenges trial counsel's failure to object when the prosecutor vouched improperly for the credibility of Commonwealth witness McCants, whose testimony placed Appellant at the scene of the crime and identified items found at the scene as belonging to him. He relies on the following comments:

Despite the fact that one of the men that she gave up is her nephew [Appellant], and the other is her godson [Wiley], she is telling the police because those two men should not have been killed, and because of that, she goes to the police and gives them the information that she has, not because

she likes one family member, or dislikes another, but because it is the truth, and she wants to help in the investigation if she can.

N.T. 3/6/2001 at 38.

Appellant also faults trial counsel for failing to object to the following comment of the prosecutor, also relating to McCants' testimony:

Catherine McCants' testimony is consistent with what she said in the statement, and is uncontradicted by Counsel. You saw him waving around those papers, looking at those papers, while she was testifying, and the one thing that he could find that was inconsistent from day one, from January 15th, 1999, to the day that she testified to you was: Wait a minute, you didn't mention the toilet paper in his hand. She said: I don't remember that toilet paper anymore.

Is that why you are going to disbelieve everything else that she says, everything else that she told you since January 15th of 1999?

N.T. 3/6/2001 at 45. He asserts that the prosecutor unmistakably urged the jury to infer that the remaining contents of the "papers" in counsel's hand were consistent with McCants' testimony. Appellant explains that McCants' first statements to police placed Wiley outside of McCants' home at the time the murders occurred, and not inside her residence, which is inconsistent with her trial testimony. Thus, he concludes, the prosecutor made a false inference from the evidence to which trial counsel should have objected.

The Commonwealth counters that Appellant's claim of ineffectiveness lacks arguable merit because the prosecutor's reference to McCants' testimony as "the truth" was in fair response to trial counsel's argument that McCants was trying to cover up for her godson, Wiley, because she was closer to his family than to Appellant's family. See N.T. 3/6/2001 at 12 (wherein trial counsel asserted, "I will leave it to you to decide whether or not you are convinced, beyond a reasonable doubt, that Miss McCants, and/or her daughter-in-law, are trying to cover up for Eric Wiley, whom they are close to. I think that

you got a bit of Miss McCants' closeness to that family, versus her closeness to [Appellant's] family.").

Regarding that component of the claim alleging that the prosecutor made a false inference from the evidence, the Commonwealth categorizes Appellant's contention as "misguided." Commonwealth's Brief at 63. It asserts that the challenged comment accurately pointed out that when trial counsel cross-examined McCants with her preliminary hearing testimony, the only inconsistency he found was that she did not remember Wiley using toilet paper on his injured hand when he came into her house on the night of the murder. N.T. 3/2/2001 at 30 (wherein McCants responds "I don't remember that part of it," when trial counsel asked whether she recalled Wiley wrapping toilet paper around his hand, and wiping his face). The Commonwealth maintains that the prosecutor's remarks constituted fair comment on the evidence, and that Appellant's "fanciful complaint" that the prosecutor was arguing non-record consistent statements is "flatly belied by the record." Commonwealth's Brief at 64.

■ The PCRA court rejected Appellant's contention that the prosecutor vouched improperly for McCants' testimony when she stated that McCants gave police information that was the truth. It found that "there is nothing improper about this statement, as it was firmly based on the evidence." PCRA Ct. Slip Op. at 26. It went on to conclude that the "prosecutor's argument was a fair response to defense counsel's suggestion that Ms. McCants was covering up for her godson, Mr. Wiley, because she favored him over [Appellant's] family." Id. (citing N.T. 3/6/2001 at 12). The PCRA court did not specifically address that component of Appellant's claim alleging that trial counsel should have objected when the prosecutor referred improperly to non-record consistent statements of McCants.

Upon review, we conclude that the PCRA court's conclusions are supported by the record and free of legal error. Trial counsel cannot be deemed ineffective for failing to object to the prosecutor's reference to the "truth" of McCants'

reports to police because such reference was in direct response to trial counsel's attack upon the credibility of McCants' testimony as biased towards Wiley and against Appellant. N.T. 3/6/2001 at 12. Thus, the PCRA court properly held that the comment constituted fair response. *Rios,* 684 A.2d at 1034. Moreover, the record supports the Commonwealth's position that the prosecutor's comments addressing the cross-examination of McCants noted the only minor discrepancy between McCants' preliminary hearing and trial testimony, and did not assert that her testimony was consistent with any non-record statements. Thus, this portion of Appellant's ineffectiveness claim fails for lack of a factual predicate.

## H. Misstatement of Robbery Law

Finally, Appellant contends that trial counsel was ineffective for failing to object when the prosecutor misleadingly suggested to the jury that any robber who possessed a gun necessarily intends to kill. He cites the following remarks:

There are many ways to do a Robbery. You can do a Robbery by putting your hand in your pocket and pretending that you have a gun, and you say: Your money or your life, basically, and people are afraid of that. That is the threat of violence, even though it is not really violent, and they give you their money.

You can use a wax gun, or a play gun, but Robbery is something else altogether, I submit to you ladies and gentlemen, when you go out there with a loaded gun, because when you are using a toy gun, or you are using your finger, you are saying basically: The risk I run if I rob someone who has a gun is that they kill me if I can't run away fast enough, but when you go out there, ladies and gentlemen, with a loaded gun in your hand, to rob someone on the street, what you are saying, by your actions, I submit to you, is: If there is any resistance, I am not the one who is going to go. The person I am robbing is the person who will be killed.

> I read somewhere once that every Robbery is a potential Homicide case, a potential First Degree Murder case, and that's why, because when you make the decision, as a robber—when this Defendant made that decision, on January 15th, to take that gun with him, to rob Milton Wise and Rodney Walters, he made the decision that if there was any resistance, he would use the gun, and they would die, that they would be the ones taking the risk, not him.

N.T. 3/6/2001 at 47–48. Appellant argues, without citation to any authority, that trial counsel should have lodged an objection to these comments because they had no basis in the record and were inflammatory and misleading.

The Commonwealth responds that this claim fails for lack of a factual predicate because the prosecutor did not suggest that a robber who possessed a gun necessarily committed the crime with an intent to kill. Rather, it asserts, the prosecutor suggested that because Appellant armed himself with a loaded gun before committing the robberies, he was prepared to kill, rather than be killed, if something went wrong. The Commonwealth maintains that this was a reasonable inference from the evidence establishing that as Appellant tried to rob Wise, Walters intervened and Appellant fatally shot both men. It concludes that because the prosecutor was entitled to argue that the evidence established a material element of the crimes, trial counsel was not ineffective for failing to object. *See Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986, 989 (1980) (holding that a prosecutor may always argue that the evidence establishes the defendant's guilt).

The PCRA court did not address this particular component of Appellant's ineffectiveness claim in its opinion. We agree with the Commonwealth, however, that the prosecutor did not suggest to the jury that one who commits a robbery with a firearm does so with the specific intent to kill. We reach this conclusion by examining both the substance and context of the prosecutor's statement. The challenged remarks were made immediately following the prosecutor's description of the elements of robbery, one of which involves the

use or threat of force.[31] *See* N.T. 3/6/2001 at 47. The comments had nothing to do with the specific intent to kill that is a requisite for first degree murder. We further agree with the Commonwealth that the prosecutor inferred from the evidence that because Appellant armed himself before robbing the victims, and ultimately shot them when Walters attempted to intervene in the robbery, he used the requisite force necessary for a robbery conviction. Under these circumstances, Appellant's ineffectiveness claim fails for lack of arguable merit.

## X. Ineffectiveness for Failing to Raise a *Batson* Challenge

 Appellant argues that trial counsel was ineffective for failing to object when the prosecutor exercised her peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[32] Before addressing the various components of Appellant's ineffectiveness claim, we review the relevant legal principles in order to place his contentions in context.

 In *Batson*, the United States Supreme Court held that a prosecutor's challenge of potential jurors solely on account of their race violates the Equal Protection Clause. 476 U.S. at 89, 106 S.Ct. 1712. The High Court set forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner. *Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1142 (2009); *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that

31. The Crimes Code provides that a person is guilty of robbery if, in the course of committing a theft, he, *inter alia*, inflicts serious bodily injury upon another or threatens another with or intentionally puts him in fear of immediate serious bodily injury. 18 Pa.C.S. § 3701(a)(1)(i), (ii).

32. To the extent this claim can be construed as raising a substantive *Batson* claim, it is waived because Appellant failed to preserve the issue during *voir dire*. *See* 42 Pa.C.S. § 9544(b) (providing that a PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding").

the prosecutor struck one or more prospective jurors on account of race. *Id.* Second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue. *Id.* Third, the trial court, which observed the prosecutor's demeanor during *voir dire*, then makes the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Id.*

To satisfy the first requirement of demonstrating a *prima facie Batson* claim, we have held that, generally, the defendant must establish that he is a member of a cognizable racial group, that the prosecutor exercised peremptory challenges to strike members of his race from the venire, and that other relevant circumstances combine to raise an inference that the prosecutor removed the jurors for racial reasons. *Ligons,* 971 A.2d at 1142; *Batson,* 476 U.S. at 96, 106 S.Ct. 1712.

Significant to the instant case, however, in cases where no *Batson* challenge was raised during the *voir dire* process, "a post-conviction petitioner is not entitled to the benefit of *Batson's* burden-shifting formula, but instead, bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence." *Ligons,* 971 A.2d at 1142 (citing *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 86 (2004)). We explained in *Uderra* that "*Batson's* burden-shifting formula makes sense when applied to an objection raised sufficiently promptly that the attorney exercising the challenges can reasonably be expected to remember the reasons for the challenge. On the other hand, it would be altogether unreasonable to shift the burden of explanation if the objection is so tardily made that the challenging attorney cannot be reasonably expected to remember." *Uderra,* 862 A.2d at 86 (citing *McCrory v. Henderson,* 82 F.3d 1243, 1251 (2d Cir.1996)).

Moreover, under circumstances where the defendant did not lodge an objection to the prosecutor's exercise of peremptory strikes during *voir dire*, this Court has generally required the defendant to present a record identifying the race of the

venirepersons stricken by the Commonwealth, the race of the prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). With this context in mind, we now turn to our discussion of Appellant's claim.

Appellant, who is African American, argues that trial counsel was ineffective for failing to object when the prosecutor employed her peremptory challenges in a discriminatory manner to strike African American venirepersons without justification. Relating to the arguable merit prong of his ineffectiveness claim, he contends that a *prima facie* case of discrimination exists under *Batson* based on: (1) the prosecutor's use of peremptory strikes to eliminate 46.7% (7 out of 15) of the African American prospective jurors, while striking only 31.8% (7 out of 22) of the non-African American prospective jurors; and, (2) the general "culture of discrimination" in jury selection in the Philadelphia District Attorney's Office. As evidence of the "culture of discrimination," Appellant relies on: a training videotape advocating discrimination in jury selection made by former Philadelphia prosecutor Jack McMahon; notes taken during a 1990 training lecture given by Bruce Sagel, which urged Philadelphia prosecutors to use racial stereotypes in jury selection; the historical practice of overall juror strike rates in Philadelphia from 1980 through 1999,[33] and the strike rates of Appellant's prosecutor in other cases unrelated to the instant case. He argues that he should have been afforded an evidentiary hearing to develop a record on these points.

As to the reasonable basis prong of the ineffectiveness test, Appellant submits that counsel "could have no reasonable strategy for failing to make the appropriate objections and

---

33. In support of this assertion, Appellant offers statistics he has compiled after examining cases eligible for the death penalty based on information purportedly obtained from the Administrative Office of Pennsylvania Courts' database. He maintains that from 1980 though 1999, Philadelphia prosecutors struck African American prospective jurors at a rate of 55%, while they struck non-African American prospective jurors at a rate of 22%.

attempt to minimize the prejudicial effects of the prosecution's racially biased use of peremptory strikes." Appellant's Brief at 75. Finally, Appellant contends that he need not demonstrate prejudice as a *Batson* violation "is structural error; thus, with proof that a *Batson* violation occurred, counsel's error in failing to make appropriate objections must likewise be presumptively prejudicial." Appellant's Brief at 75.

The Commonwealth responds that Appellant's claim "is so absolutely refuted by the record as to be frivolous." Commonwealth's Brief at 65. First, it asserts that Appellant has failed to make a proper record identifying the race of the venirepersons struck by the Commonwealth, the race of the prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury, as required by this Court's decision in *Spence*. Based on this ground alone, the Commonwealth submits, Appellant's claim should be rejected. *See Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 736 (1999) (rejecting *Batson* claim because the defendant did not meet the threshold requirement of developing the record of the race of prospective jurors acceptable to the Commonwealth, but stricken by the defense, and the racial composition of final jury).

Second, the Commonwealth maintains that Appellant has failed to satisfy his burden of proving his claim. It reiterates that, pursuant to *Uderra*, a PCRA petitioner challenging trial counsel's failure to lodge a *Batson* objection during *voir dire* must prove actual, purposeful discrimination by a preponderance of the evidence. Nevertheless, the Commonwealth asserts, Appellant only purports to allege a *prima facie* case of discrimination, which standard has no application on collateral review where a PCRA petitioner does not have the benefit of *Batson's* burden-shifting formula.

Third, the Commonwealth refutes Appellant's reliance on the prosecutor's strike rate and the alleged "culture of discrimination." It emphasizes that the actual jury chosen consisted of six African Americans, five Caucasians, and one individual who identified his race as "other." Thus, half of the jury consisted of individuals who shared the same race as

Appellant. The Commonwealth submits that this strongly refutes any notion of racial discrimination in jury selection. Even assuming the prosecutor struck more African Americans than Caucasians (46.7% versus 31.8%), the Commonwealth argues that this fact is inadequate to demonstrate purposeful discrimination.

Likewise, the Commonwealth maintains, Appellant's proffer of a "culture of discrimination" in the Philadelphia District Attorney's Office does nothing to advance his *Batson* claim because the individual assertions in support thereof have no relevance to the selection of Appellant's jury. For this reason, it submits, this Court has routinely rejected similar claims. Specifically, the Commonwealth submits, neither the training videotape prepared by former prosecutor Jack McMahon nor the 1990 lecture given by Bruce Sagel have any relevance because those individuals did not try Appellant's case. *See e.g. Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 443 n. 10 (1999) (holding that the mere existence of the McMahon tape does not demonstrate that there was discrimination in the selection of the defendant's jury). The Commonwealth also discounts Appellant's reliance on the "historical practice" of overall jury strikes by Philadelphia prosecutors, as well as Appellant's prosecutor's alleged strike rates in six cases unrelated to the instant case. It characterizes Appellant's purported findings as suspect and irrelevant to whether the prosecutor engaged in discrimination in the instant case. As the underlying *Batson* claim lacks arguable merit, the Commonwealth concludes that trial counsel cannot be deemed ineffective for failing to raise it.

The PCRA court similarly rejected Appellant's claim. First, it found that Appellant failed to identify and make a record of the race of the specific venirepersons stricken by the Commonwealth, the race of those found acceptable to the Commonwealth, but stricken by the defense, and the racial composition of the final jury. As it was Appellant's burden to do so, the court concluded that his underlying *Batson* claim failed. PCRA Ct. Slip Op. at 30. Second, it rejected Appellant's reliance on the prosecutor's strike rate in the instant

case, holding that "the prosecutor's proffer indicates that she accepted 8 of 15 African American venirepersons as jurors, and the final jury was made up of six African Americans, one who identified himself as 'other,' and five whites." *Id.* Third, the court further rejected Appellant's suggestion that a "systematic discriminatory policy" employed by the Philadelphia District Attorney's Office evinced a *prima facie* case that the prosecutor engaged in purposeful racial discrimination. *Id.* It found that Appellant's assertions were irrelevant and concluded that he "failed to show how allegedly discriminatory trends affected jury selection in this case, particularly since the jury composition was 50% African American, and the prosecutor accepted more than half of the eligible African American venirepersons." *Id.* at 31 (citing *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 523 (2004) (rejecting a claim of racial discrimination that relied on similar evidence where defendant showed no links between such evidence and his particular case)).

■ Upon careful review, we find that the PCRA court's conclusions are supported by the record and free of legal error. For purposes of argument, we assume that Appellant satisfied his burden under *Spence* to develop properly a record in support of his *Batson* claim. Nevertheless, in a case such as this where trial counsel did not lodge a contemporaneous *Batson* objection during *voir dire*, Appellant is not entitled to the benefit of *Batson's* burden-shifting formula and must demonstrate actual purposeful discrimination by a preponderance of the evidence. *Uderra*, 862 A.2d at 86. The only evidence proffered that relates to the empanelling of Appellant's particular jury is the fact that the prosecutor peremptorily struck more African Americans than Caucasians. This fact, absent any other evidence of discrimination, is insufficient to demonstrate purposeful discrimination. *See Ligons*, 971 A.2d at 1125 (holding that the prosecutor's striking of more African Americans than Caucasians, in and of itself, is insufficient to demonstrate purposeful discrimination). Considering the totality of the circumstances, we do not find the slight disparity in exercise of peremptory strikes to be such as to

indicate racial discrimination. As emphasized by the Commonwealth and the PCRA court, half of the jurors ultimately chosen shared the same race as Appellant. *See Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 608 (2008) (holding that the racial composition of the jury, the race of the victim, and the race of the defendant serve as circumstantial evidence relevant to evaluation of a *Batson* claim). Further, Appellant has not pointed to any .comments made by the prosecutor during *voir dire* that would suggest that the prosecutor was racially biased, nor has Appellant demonstrated that this case was racially sensitive. *See Ligons*, 971 A.2d at 1144 (in rejecting an underlying *Batson* claim, the court noted that the record did not contain any questionable remarks made during jury selection that would suggest a motive to discriminate based on race; nor was the case racially sensitive as the appellant and the victim shared the same race); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1213–14 (2006) (holding that when evaluating a *Batson* claim alleging gender discrimination, a court may look to whether the prosecutor made any questionable remarks during jury selection).

■ Finally, we concur in the PCRA court's finding that, even if believed, Appellant's general claim of a "culture of discrimination" in the Philadelphia District Attorney's Office is inadequate to demonstrate purposeful discrimination in the selection of his particular jury. *See Ligons*, 971 A.2d at 1145 (holding that "Appellant's blanket claim of a 'culture of discrimination' in the Philadelphia District Attorney's Office is insufficient to demonstrate purposeful discrimination as the various assertions do not involve the prosecutor who selected Appellant's jury and have no connection to his individual case"). The existence of the McMahon tape, in which then-prosecutor Jack McMahon set forth his discriminatory views on jury selection, is irrelevant because McMahon was not the prosecutor at Appellant's trial. *See Commonwealth v. Marshall*, 596 Pa. 587, 947 A.2d 714, 722 (2008) (condemning the discriminatory practices advocated in the McMahon videotape, but holding that the tape does not establish a policy of racial discrimination in jury selection, and does not suggest discrimi-

nation in cases where McMahon did not prosecute). Likewise we have expressly rejected any reliance on notes from the 1990 Sagel lecture as establishing a policy of racial discrimination in jury selection where there is no link between the lecture and the case at hand. *Id.* Finally, we reject Appellant's reliance on statistical findings relating to the "historical strike rate" of both the Philadelphia District Attorney's Office and the particular prosecutor in this case. Even assuming, for purposes of argument, that such statistics are accurate, they simply do not suffice to satisfy Appellant's burden of proving actual purposeful discrimination under the facts presented. As trial counsel had no basis to make a *Batson* challenge during *voir dire,* he cannot be deemed ineffective for failing to do so.

Accordingly, we likewise conclude that Appellant was not entitled to an evidentiary hearing on this claim. Appellant has not raised any issues of material fact, which, if believed, would entitle him to relief. Additionally, no purpose would be served by any further evidentiary proceedings on this issue. Thus, the PCRA court did not abuse its discretion by denying his request for an evidentiary hearing.

## XI. Ineffectiveness for Failing to Object to Jury Charge on Intent to Kill

Appellant next argues that trial counsel was ineffective for failing to object when the trial court informed the jury that it was permitted to infer specific intent to kill from the use of a deadly weapon on a vital part of the body.[34] In support of the arguable merit component of his ineffectiveness claim, he contends that this instruction created an impermissible presumption of guilt, and relieved the Commonwealth of its burden of proving first degree murder. Appellant asserts that the charge violated his constitutional right to due process

---

**34.** Specifically, the trial court instructed the jury as follows:

In addition, if you believe that the Defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may infer that the Defendant had the specific intent to kill.

N.T. 3/6/2001 at 73.

because it urged the jury to infer an essential element of first degree murder (the specific intent to kill) from another (the act of killing).

Alternatively, he submits that even assuming the challenged instruction generally does not violate due process, its use in this case did so. Appellant contends that the jury could not have rationally concluded from the evidence that he possessed the specific intent to kill merely because he fired his weapon into a vital part of the victim's body. Rather, he asserts, the shots could have been fired accidentally during a robbery attempt, and without the specific intent to kill. He concludes that because the jury could not rationally infer from the circumstances of the robbery that he had the specific intent to kill, the trial court's instruction that the jury may rely on such inference violated the Fourteenth Amendment, and trial counsel was ineffective for failing to object.

As to the reasonable basis prong of the ineffectiveness test, Appellant argues that trial counsel had an obligation to object to erroneous jury instructions, particularly when they shifted the burden to the defense to disprove the key element of first degree murder. He asserts that "[t]here could be no reasonable strategic purpose behind counsel's failure to ensure, before the charge began, that the trial court would not give this instruction, or to object to the charge and seek appropriate curative measures once it did." Appellant's Brief at 87. Finally, Appellant contends that trial counsel's failure to object to the jury charge prejudiced him. Had trial counsel objected to the jury instruction, he submits, there is a reasonable likelihood that the court would have omitted the charge, which would have precluded the jury from basing its verdict on the impermissible presumption.

The Commonwealth responds that trial counsel was not ineffective for failing to object when the trial court instructed the jury that specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the body. It argues that Appellant's claim lacks arguable merit because this Court has routinely rejected similar challenges. *See Commonwealth v. Murphy*, 559 Pa. 71, 739 A.2d 141, 150 (1999) (rejecting

Appellant's claim that trial counsel was ineffective for failing to object to the charge informing the jury that it could infer malice from the use of a deadly weapon on a vital part of the victim's body because such instruction is "consistent with long-standing jurisprudence of this Court"); *Commonwealth v. Ly,* 528 Pa. 523, 599 A.2d 613, 619 (1991) (holding that "the instructions that the jury could infer malice or intent to kill from the use of a deadly weapon upon a vital part of the body was proper and does not shift the burden of production to the defendant"). Contrary to Appellant's assertion, the Commonwealth submits, the challenged jury instruction did not lessen its burden of proof, but rather permitted the jury to draw the logical inference that firing a gun into a vital part of the victim's body is circumstantial evidence that the shooter intended to kill the victim. Emphasizing that the jury was free to reject the inference, the Commonwealth maintains that the instruction was proper and did not serve as a basis for trial counsel to lodge an objection. *See Commonwealth v. O'Searo,* 466 Pa. 224, 352 A.2d 30, 36–37 (1976) (rejecting challenge to instruction that the jury could infer malice or intent to kill from the use of a deadly weapon upon a vital part of the body and holding that the inference arising from the instruction is permissive, allowing the jury to either accept or reject it based on the attendant circumstances).

The PCRA court rejected Appellant's ineffectiveness claim as lacking arguable merit. It held that the challenged jury charge was "entirely proper, and did not relieve the Commonwealth of its burden of proving any element of first degree murder beyond a reasonable doubt." PCRA Ct. Slip Op. at 21. The court explained that the instruction merely permitted the jury to draw the inference of specific intent to kill from Appellant's use of a deadly weapon on a vital part of the victim's body. *Id.* It emphasized that "[t]his permissive instruction by no means required that the jury make such an inference—they were free not to infer specific intent to kill." *Id.* The court further noted that the instruction was consistent with established case law that a jury may infer specific intent to kill from the use of a deadly weapon on a vital part of the

body. *See Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 583 (1998) (holding that "a specific intent to kill may be proven by circumstantial evidence, and therefore, may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body").

 The PCRA court's conclusions are supported by the record and free of legal error. This Court rejected arguments identical to those currently raised by Appellant in *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586 (2007), where we held that an instruction permitting the jury to infer the specific intent to kill from the appellant's use of a deadly weapon on a vital part of the victim's body was in accordance with the law, and that trial counsel was not ineffective for failing to object. *Id.* at 608. We reach the same conclusion here. Moreover, we are not persuaded by Appellant's suggestion that even if the charge is generally valid, it was invalid as given in his case. Contrary to his contention that the charge shifted improperly the burden of proof to him, the charge, when read as a whole, specifically informed the jury that Appellant was presumed innocent, and did not have to prove anything in his defense. N.T. 3/6/2001 at 63; *see also Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 314 (1999) (holding that in addressing challenges to jury instructions, we consider the challenged portions in light of the entire instruction). The charge further explained that only the Commonwealth bears the burden of proving the elements of the offenses charged. *See* N.T. 3/6/2001 at 63 (wherein the trial court stated "It is not the Defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crimes charged, and that the Defendant is guilty of those crimes, beyond a reasonable doubt."); *see also id.* at 64 (wherein the trial court reiterated that "[t]he Commonwealth has the burden of proving the Defendant guilty, beyond a reasonable doubt."). Accordingly, Appellant's claim fails for lack of arguable merit.[35]

**35.** Additionally, we reject Appellant's contention that he is entitled to a hearing on this meritless claim that raises no genuine issues of material fact. No purpose would be served by further proceedings on this issue.

## XII. Ineffectiveness for Failing to Object to
## Jury Charge on Third Degree Murder

Without citation to authority, Appellant argues that trial counsel was ineffective for failing to object when the trial court defined third degree murder as requiring the absence of the specific intent to kill.[36] Relating to the arguable merit component of his ineffectiveness claim, he contends that this instruction, coupled with the instruction that the jury may infer specific intent to kill from the use of a deadly weapon on a vital part of the body, denied him due process by precluding the jury from finding Appellant guilty of the lesser charge of third degree murder. Considering the dearth of evidence of the specific intent to kill and evidence establishing that a robbery even took place, Appellant maintains, trial counsel should have objected to the erroneous jury charge.

As to the second prong of the ineffectiveness test, Appellant submits that "[t]rial counsel had no reasonable strategy for

**36.** The trial court's charge on third degree murder provided as follows:

Now, Murder in the Third Degree. Murder in the Third Degree is an unlawful killing of a human being, with malice; that is, with an intention to inflict grievous bodily harm, but not necessarily an intention to take human life, and yet, as a result of the infliction of the injury, death occurs.

In other words, Third Degree Murder includes any unlawful killing of a human being, with malice, but where no intention to kill exists, or can reasonably and fully be inferred.

Thus, if there is an unlawful killing, where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, but if no intention to kill can be inferred or collected from the facts, then the verdict should be guilty of Murder in the Third Degree.

Malice, in Murder in the Third Degree, is the malicious design to do harm, but not to kill.

Therefore, in order to find the Defendant guilty of Third Degree Murder, you must find that the Defendant unlawfully took the life of the victim, with malice of forethought, with no specific intent to kill, but with an intention to inflict grievous bodily harm, yet, as a result of the inflicting of the injury, death occurs.

I remind you: If you find that the killing was with no intention to kill, but only to inflict grievous bodily harm, while it would ordinarily be Third Degree Murder, if you find, beyond a reasonable doubt, that it occurred in the commission of a Felony, it would be Second Degree Murder.

N.T. 3/6/2001 at 76–77.

failing to litigate this meritorious claim." Appellant's Brief at 90. Finally, he contends that he was prejudiced by trial counsel's omission because the jury was precluded from finding him guilty of third degree murder, and there is a reasonable probability that the outcome of the trial would have been different had counsel objected to the erroneous instruction.

The Commonwealth counters that Appellant's claim lacks arguable merit as the challenged instruction on third degree murder was an accurate statement of the law. Contrary to Appellant's contention, it maintains that the court's instruction did not "force" the jury to convict him of first degree murder, but rather set forth each degree of murder and the possible verdicts as to each victim. The Commonwealth further emphasizes that Appellant offers no legal authority in support of his claim. Because trial counsel had no basis to object to the court's correct statement of the law, the Commonwealth submits that trial counsel cannot be deemed ineffective. *See Rios*, 920 A.2d at 801 (holding that trial counsel cannot be deemed ineffective for failing to object to proper jury instructions).

The PCRA court summarily rejected Appellant's claim, finding that "[t]his court's instruction that third degree murder is a killing without specific intent was an accurate statement of the law." PCRA Ct. Slip Op. at 22. It further noted that the jury's finding of second degree murder for the killing of Mr. Walters is proof that the jury was not forced to convict Appellant of first degree murder.

■■■ Once again, we conclude that the PCRA court's conclusions are supported by the record and free of legal error. "It is well-established that third degree murder is distinguishable from first degree murder in that only first degree murder requires the specific intent to kill." *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 525 (2009); *see also* 18 Pa.C.S. § 2502(a) & (c) (defining the various degrees of murder). Thus, the trial court's charge was proper, and Appellant's ineffectiveness claim fails for lack of arguable merit.

### XIII. Cumulative Error

Appellant argues that even if we find that he is not entitled to relief based on any particular error, "he is nevertheless entitled to relief because the cumulative effect of counsel's deficiencies, and the accumulated effect of all of the errors." Appellant's Brief at 91. In response, the Commonwealth argues that "no number of failed claims may collectively attain merit if they could not do so individually." Commonwealth's Brief at 76–77 (citing *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992)). Thus, it argues, Appellant's claim of cumulative error fails.

 As cogently noted by the Commonwealth, this Court has repeatedly held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532 (2009). Thus, to the extent claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. *Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 671 (2008). When the failure of individual claims is grounded in lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed. *Johnson,* 966 A.2d at 532 (citing *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994), for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

 Here, we have not disposed of any of Appellant's claims solely on the grounds of lack of prejudice.[37] Thus, we have found no errors from which we can cumulatively assess the prejudice suffered by Appellant. Under these circumstances, Appellant is not entitled to relief.

**37.** Our resolution of Issue I, regarding whether trial counsel was ineffective for failing to challenge Appellant's conviction on due process grounds, noted only as an alternative ground that Appellant was not prejudiced by trial counsel's omission.

## XIV. Discovery Requests

 Appellant argues that the PCRA court erred by denying his requests for discovery of ballistics reports and the "homicide file." As noted, we review the denial of discovery for an abuse of discretion. *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 272 (2008). Discovery in death penalty collateral proceedings is permissible only upon leave of court, and only for good cause shown. Pa.R.Crim.P. 902(E)(2). " 'A showing of good cause requires more than just a generic demand for potentially exculpatory evidence.' " *Collins,* 957 A.2d at 272 (quoting *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 750 (2004)).

### A. Ballistics Reports

Regarding the ballistics reports, Appellant maintains that he received a copy of only two pages of information pertaining to the bullets retrieved from each of the two victims. He argues that he needed the complete ballistics report, which may have been exculpatory to him, and that the PCRA court abused its discretion in denying discovery. The Commonwealth responds that it provided extensive discovery to Appellant in connection with the PCRA proceedings, and that his request for additional discovery is based entirely on speculation that the requested materials might be exculpatory. *See Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 261 (2006) (holding that speculation that requested documents will uncover exculpatory evidence does not satisfy the requirements of Pa.R.Crim.P. 902(E)(2)). It emphasizes that ballistics evidence has never been at issue in this case, and Appellant has failed to provide any basis for his supposition that additional material exists.

 We agree with the Commonwealth that Appellant has failed to demonstrate that the PCRA court abused its discretion by denying his request for additional discovery relating to ballistics reports that may or may not exist. Appellant has failed to make any showing of good cause why this information, if it existed, would have been exculpatory to him. Under

these circumstances, the PCRA court properly denied Appellant's discovery request.

## B. Homicide File

Appellant also argues that the PCRA court abused its discretion by denying his request for discovery of the "homicide file." He alleges that "additional evidence and information known to the police exculpated him, impeached the credibility of Commonwealth witnesses, and inculpated Wiley." Appellant's Brief at 93. Appellant fails to elaborate on such "additional evidence," but nevertheless maintains that "there is reason to believe" that the police interrogation of Wiley was "affected by other information police had on hand at the time of the interrogation." *Id.* He summarily concludes that "[a]s the Homicide File contains all information pertaining [to] the investigation of the homicides, the lower court erred in failing to order the Commonwealth to provide those materials." *Id.*

The Commonwealth counters that the PCRA court did not abuse its discretion by denying Appellant's discovery request. It asserts that Appellant's conjecture that an opportunity to peruse the entire police homicide file might yield helpful evidence does not constitute good cause. *See Abu–Jamal,* 720 A.2d at 91 (holding that the PCRA court properly rejected the request for "wholesale discovery of whatever information [the petitioner] 'believed' to exist and/or files so that he could discern whether his assertions were true").

We agree with the Commonwealth that the PCRA court did not abuse its discretion in denying Appellant's request for discovery of the homicide file. As with the previous claim, Appellant has not made a showing of good cause as he is unaware whether exculpatory information even exists.[38]

38. Appellant further argues that the PCRA court erred by failing to grant him an evidentiary hearing. We have already rejected this claim in connection with the various issues in which such allegations were made.

## XV. Conclusion

For the reasons stated herein, the order of the PCRA court denying relief is affirmed. Jurisdiction is relinquished.[39]

Chief Justice CASTILLE, Justices EAKIN, TODD, McCAFFERY and ORIE MELVIN, join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

According to the majority opinion, it is undisputed that trial counsel performed incompetently relative to one of the two phases of Appellant's capital trial (*i.e.*, penalty). *See* Majority Opinion at 203–04, 30 A.3d at 438. As to the other phase, Appellant reports that counsel has been uncooperative in the post-conviction investigation. Nevertheless, the case is being disposed of without a factual hearing.

In approving such treatment, the majority applies the review standard subsuming consideration of whether the disposition is supported by the record. *See* Majority Opinion, at 203–04, 30 A.3d at 438. It bears repeating, however, that there simply is no evidentiary record concerning Appellant's *extra-record* claims, such as those of deficient attorney stewardship, since he was denied a post-conviction hearing.

My thoughts concerning the appropriate treatment and frame of reference for appellate review of these dismissals have been set out at length elsewhere. *See, e.g., Commonwealth v. Smith,* 609 Pa. 605, 677–79, 17 A.3d 873, 915–17 (2011) (Saylor, J., dissenting). I respectfully dissent here, as well, in favor of an evidentiary hearing.

---

**39.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).